687 F.2d 1324
 13 Envtl. L. Rep. 20,445
 JICARILLA APACHE TRIBE, Plaintiff-Appellant-Cross-Appellee,
v.
Cecil D. ANDRUS, Secretary of the Interior of the United
States of America; and Amoco Production Company;
Benson-Montin-Greer Drilling Corporation; Dugan Production
Corporation; Gulf Oil Corporation; Hicks-Enco, Inc.; J. M.
Huber Corporation; Merrion and Bayless Drilling; Mesa
Petroleum Company; Nassau Resources, Inc.; North American
Exploration Company; Southland Royalty Company; Tesoro
Petroleum Corporation; Union Oil Company of California,
Defendants-Appellees-Cross- Appellants.
 Nos. 80-1481, 80-1586, 80-1632 to 80-1640 and 80-1685.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 20, 1982.
 
 Terry D. Farmer of Moses, Dunn, Beckley, Espinosa & Tuthill, and B. Reid Haltom of Nordhaus, Haltom & Taylor, Albuquerque, N. M. (Robert J. Nordhaus, Albuquerque, N. M., also of that firm, with him on the brief), for plaintiff-appellant-cross-appellee, Jicarilla Apache Tribe.
 Edward J. Schawaker, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Sanford Sagalkin, Deputy Asst. Atty. Gen., Peter R. Steenland, Jr., Chief, Appellate Section, and Jose N. Uranga, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for defendant-appellee-cross-appellant Cecil D. Andrus, Secretary of the Interior.
 Lynn H. Slade of Modrall, Sperling, Roehl, Harris & Sisk, P. A., Albuquerque, N. M. (John R. Cooney, Albuquerque, N. M., also of that firm, for Southland Royalty Co.; Michael B. Campbell of Campbell & Black, P. A., Santa Fe, N. M., for Gulf Oil Corp.; S. B. Christy, IV, of Jennings & Christy, Roswell, N. M., for Amoco Production Co., J. M. Huber Corp., Mesa Petroleum Co., Union Oil Co. of California, and Nassau Resources, Inc.; Jason W. Kellahin of Kellahin & Kellahin, Santa Fe, N. M., for Tesoro Petroleum Corp. and North American Exploration Co.; Breck Tommy Roberts, Farmington, N. M., for Dugan Production Corp.; Richard T. C. Tully and James B. Cooney, P. A., Farmington, N. M., for Benson-Montin-Greer Drilling Corp., Merrion and Bayless Drilling, and Hicks-Enco, Inc., with him on the brief), for defendants-appellees-cross-appellants Amoco Production Co., Benson-Montin-Greer Drilling Corp., Dugan Production Corp., Gulf Oil Corp., Hicks-Enco, Inc., J. M. Huber Corp., Merrion and Bayless Drilling, Mesa Petroleum Co., Nassau Resources, Inc., North American Exploration Co., Southland Royalty Co., Tesoro Petroleum Corp., and Union Oil Co. of California.
 Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 In 1976 the Jicarilla Apache Tribe (the Tribe) filed this action against the Secretary of the Interior and certain oil and gas lessees (lessee defendants or the companies), claiming that the Secretary failed to comply with his regulation, 25 CFR § 171.3, when advertising four sales of oil and gas leases on the Jicarilla Apache Indian Reservation. The Tribe also alleged failure to comply with the National Environmental Policy Act (NEPA). The Tribe sought a declaration that the nonproducing leases were invalid and an order directing the Secretary to cancel them. In addition the Tribe sought an order that the Secretary prepare an environmental impact statement for producing leases and that he recommend changes in the lease terms based thereon.
 
 
 2
 The Secretary denied any violation of the statutes or regulations in the advertising of the sales of the oil and gas leases, as did the lessees defendants. The Secretary and the lessee defendants denied that NEPA applied and asserted equitable defenses against the claim of violation of the regulations and the NEPA claim. The lessee defendants also counterclaimed for damages, alleging wrongful action by the Tribe in filing this action, breach of the leases by the Tribe in bringing suit, and violation of various provisions of the Indian Civil Rights Act, 25 U.S.C. §§ 1301 et seq.[1]
 
 
 3
 The four lease sales were conducted by the Bureau of Indian Affairs (BIA) on April 22, 1970, July 14, 1971, November 17, 1971, and September 6, 1972, by sealed-bid auction pursuant to 25 U.S.C. § 396b. Of a total 415,885.90 acres offered, 276,117.61 acres were actually leased. At trial the companies essentially sought to demonstrate lack of violation of the regulations on notice procedures, lack of harm to the Tribe's interests, compliance with NEPA, and laches and unclean hands.
 
 
 4
 The trial court found that there had been a "technical violation" of the notice requirements of 25 CFR § 171.3, but it declined to order outright cancellation. Instead, the court declared the Secretary's actions to be violative of the regulation and ordered the Secretary to "cancel a lease unless, within 60 days from entry of final judgment, the particular lessee pays plaintiff Jicarilla Apache Tribe an adjusted bonus" based on a percentage of the bonus payment recommended in testimony by the Tribe's expert. The court also tolled the primary lease terms and delay rentals from the date of service of process to the date of judgment. The NEPA claim was rejected on a finding of laches and unclean hands on the part of the Tribe. Finally, the lessee defendants' counterclaims were dismissed on the ground of the Tribe's sovereign immunity. 546 F.Supp. at 587.
 
 
 5
 The parties appealed and cross-appealed. The Tribe argues that leases issued in violation of the regulations are void and must be cancelled; that the district court erred in awarding "speculative damages" by the adjusted bonus payments; that non-compliance with NEPA compels cancellation; that the court's finding of laches and unclean hands as to the NEPA claim was error; that the leases cannot be tolled to extend beyond their statutory term; that delay rentals were improperly suspended during litigation; and that the Tribe should have been awarded costs.
 
 
 6
 The Secretary urges that there was no violation of the statutory notice requirements; that the BIA complied with its longstanding, reasonable interpretation of 25 CFR § 171.3; and that the court properly denied relief under NEPA because of laches and unclean hands.
 
 
 7
 The lessee defendants argue that the district court erred in finding a violation of 25 CFR § 171.3; that the court erroneously placed the burden on the lessees to prove that any violation of the regulations did not harm the Tribe; that the court properly denied outright cancellation but erroneously failed to deny all relief for noncompliance with 25 CFR § 171.3 due to laches and unclean hands; and that the Tribe waived its sovereign immunity as to the counterclaims by filing this action.
 
 
 8
 We turn first to the basic issue whether the Secretary's regulations were violated in giving notice of the lease sales.
 
 
 9
 * Propriety of the procedures used to give notice of the lease sales
 
 
 10
 The notice procedures which the Government must follow when offering oil and gas leases for sale on behalf of Indian tribes are set forth in 25 CFR § 171.3, 22 Fed.Reg. 10588 (1957), as amended at 23 Fed.Reg. 7068 (1958), promulgated pursuant to 25 U.S.C. § 396b.[2] Section 171.3 provided in pertinent part as follows:
 
 
 11
 (a) At such times and in such manner as he may deem appropriate, after being authorized by the tribal council or other authorized representative of the tribe, the superintendent shall publish notices at least thirty days prior to the sale, unless a shorter period is authorized by the Commissioner of Indian Affairs, that oil and gas leases on specific tracts, each of which shall be in a reasonably compact body, will be offered to the highest responsible bidder for a bonus consideration, in addition to stipulated rentals and royalties....
 
 
 12
 (b) All notices or advertisements of sales of oil and gas leases shall reserve to the Secretary of the Interior the right to reject all bids when in his judgment the interests of the Indians will be best served by so doing, and that if no satisfactory bid is received, or if the accepted bidder fails to complete the lease, or if the Secretary of the Interior shall determine that it is unwise in the interests of the Indians to accept the highest bid, the Secretary may readvertise such lease for sale, or if deemed advisable, with the consent of the tribal council or other governing tribal authorities, a lease may be made by private negotiations. The successful bidder or bidders will be required to pay his or their share of the advertising costs.... (Emphasis added).
 
 
 13
 The trial court found, and its findings in this regard are undisputed, that the notice actually given to potential bidders for the leases in question consisted of (1) a "short-form notice" which appeared in various trade publications at least thirty days prior to leasing, and (2) a "long-form notice" which concededly contained all the information required by the regulation.
 
 
 14
 Although never printed in any newspaper or trade journal, the long-form notice was distributed in three ways: first, more than 30 days prior to the sale it was mailed to names in a BIA file of individuals and companies which had expressed an interest in leases on the Jicarilla Reservation. Second, bulk mailings were made to some BIA offices and post offices in the area to be put on display. Third, it was sent to anyone requesting details of the sale.
 
 
 15
 One of the short form notices which appeared in trade publications read as follows (I J.App. A-29):
 
 Legal Notice
 
 16
 U. S. DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS. Notice is hereby given that 25 tracts of Jicarilla Tribal lands comprising 58,017 acres located in Rio Arriba and Sandoval Counties, New Mexico in the Eastern San Juan Basin are offered for Competitive Bidding for Oil and Gas Leasing through sealed bids. Leases will be granted to the qualified bidder of the highest cash bonus offer per acre. Bids will be opened at 2:00 p. m. Mountain Standard Time, April 22, 1970 in the office of the Jicarilla Apache Tribe, Dulce, New Mexico. Full details of the offering, how, when, and where to submit bids may be obtained from the Superintendent, Jicarilla Agency, Dulce, New Mexico 87528, Telephone Number (505) 759-3201.
 
 
 17
 The long-form notice filled two and a half printed pages, not including the description of tracts.[3] (I J.App. A-30-33).
 
 
 18
 The first issue before us is whether these procedures as used complied with the regulations.[4] It appears that the shortform notice was not intended by the Secretary to fulfill the content requirements of 25 CFR § 171.3, (Appellant's Brief in Chief 6; Brief for the Secretary 13-14; VII J.App. A-1047), and it seems clear to us that it does not comply. The short-form notice did not describe the specific tracts to be offered. Nor did it set out the stipulated rentals and royalties and the fact that the Secretary reserved the right to reject all bids.
 
 
 19
 The lessee defendants contend, however, that in actuality the regulation does not require the inclusion in a published notice of a description of the specific tracts being offered. Rather, as the lessees interpret it, the regulation's requirement of published notice "... that oil and gas leases on specific tracts ... will be offered ..." merely requires notifying bidders that only specific tracts previously identified, and not the reservation lands at large, can be bid upon. (Brief and Answer Brief for Appellees Amoco et al. 21-22). The lessees also urge that the clause of the regulation reading "in addition to stipulated rentals and royalties" can be read to prescribe merely the terms of the leases rather than the contents of the notice. (Id. at 22-23). The Secretary and the companies argue that the mandate to "publish" was satisfied by distribution of the long form notices to companies on the lists and to post offices, particularly in light of the further distribution made of the short form notices in accord with the BIA's long-time practice. (Brief for the Secretary at 15; Brief and Answer Brief for Appellees Amoco, et al. at 23-26; Reply Brief for Appellees Amoco et al. at 3-11).
 
 
 20
 We are not persuaded by these arguments and agree instead with the view of the trial court. In referring to "specific tracts" and "stipulated rentals and royalties," 25 CFR § 171.3, deals with notice requirements, not the content or terms of the leases. Other sections address the requirement that specific leases cover lands in a compact body, 25 CFR §§ 171.8 and 171.9, and the amount of rentals and royalties, 25 CFR § 171.13. We must give effect to the plain language of the mandate in the regulation that the superintendent "shall publish notices ..." and the closely following clauses "that oil and gas leases on specific tracts ... will be offered ... for a bonus consideration in addition to stipulated rentals and royalties ..."
 
 
 21
 The provision that publication may be at such times and in such manner as the Superintendent deems appropriate does not dispense with the clear mandate to "publish notices" and its close connection to their specified contents. In view of these mandatory provisions and their purpose, we are convinced that there had to be publication carrying the essentials of the notice-that oil and gas leases on specified tracts would be offered, that the offer was based on stipulated rentals and royalties, and that there was a reservation that the Secretary might reject bids not deemed in the interest of the Indians. In the context of this kind of notice, the ordinary meanings of publish "to make generally known ... to make public announcement ... to place before the public: Disseminate," Webster's New Collegiate Dictionary at 933 (1975), clearly point to general publication by a regular medium of publication. As the trial judge concluded: "The procedures employed, viewed as a whole, did not reach the Section 171.3 mark."
 
 
 22
 It is argued that an administrative interpretation of the regulation has been made by the Indian Affairs Manual and by the procedures used, to which deference should be given, Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616; Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, particularly because of past reliance on them. We are convinced, however, that the plain, mandatory terms of the regulations do not leave room for deference to this interpretation, which does not serve the interest of the Indians. If there is any doubt, the interpretation should be made liberally in favor of the Indians for whose protection these provisions were promulgated. Antoine v. Washington, 420 U.S. 194, 199-200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129; Bryan v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710. This rule of construction pertaining to statutes and treaties should also govern the interpretation of the regulations. Regulations are generally subject to the same rules of construction as statutes. Rucker v. Wabash Railroad Co., 418 F.2d 146, 149 (7th Cir.).
 
 
 23
 In sum we conclude, as did the trial court, that the publication procedures used failed to comply with the regulation.
 
 II
 
 24
 The equitable remedy chosen by the trial court
 
 A.
 
 25
 Having found a technical violation of the regulation on notice procedures, the district judge declined to order outright cancellation and instead provided in his decree that cancellation of any of the leases could be avoided by payment of adjusted bonuses to the Tribe. The adjusted bonus payments were to be equal to the difference between the bonuses actually paid and 60% of the bonus payments which Mr. Reese, a geologist who testified as an expert for the Tribe, testified he would have recommended to a bidder. The trial judge stated that on the whole he found Reese's testimony competent and credible on the basis of Reese's long and extensive familiarity with the geology of the area, with specific reference to oil and gas development in the San Juan Basin. The judge stated that he had discounted Mr. Reese's estimate as to the amount of bonus payments which the leases should have generated to the extent the court felt that Reese had been impeached. 546 F.Supp. at 578.
 
 
 26
 For reversal and a decree of cancellation, the Tribe argues that in light of the violations of the notice requirements of 25 CFR § 171.3, the leases were void ab initio and must be cancelled, citing Gray v. Johnson, 395 F.2d 533 (10th Cir.), cert. denied, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364, inter alia. That case, however, concerned court review of the Secretary's administrative decision to cancel a 10-year lease of an Indian's land which had earlier been approved, but which the Secretary found on administrative appeal to be void for violation of regulations limiting the length of leases on dry farming land to five years. We held that "the execution of the lease was an administrative error which the Secretary can correct by cancellation of the lease." Id. at 537. (Emphasis added). We thus upheld the administrative determination there to cancel, but the case does not compel an equity court to order cancellation of all leases on Indian land for every procedural error in the leasing procedure. We feel the Gray case is distinguishable.
 
 
 27
 The case before us is denominated by the first amended complaint as a "Petition for Declaratory Judgment and Writ of Mandamus." (I J.App. A-1). The complaint prays that the Secretary's actions in approving the leases be declared illegal and invalid and that he be directed to cancel the leases, except those on which drilling is or has been contracted or is in progress, or from which production has been obtained in paying quantities. (I J.App. A-20). In essence, the prayer is for the equitable remedy of cancellation.[5]
 
 
 28
 The equitable nature of this suit is of paramount importance. "When Congress leaves to the federal courts the formulation of remedial details, it can hardly expect them to break with historic principles of equity in the enforcement of federally-created equitable rights." Holmberg v. Armbrecht, 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743. If Congress had intended to make a drastic departure from the traditions of equity practice, an unequivocal statement of that purpose would have been made. An appeal to the equity jurisdiction of the federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity. Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754. We should not "lightly assume that Congress has intended to depart from established (equitable) principles." Weinberger v. Romero-Barcelo, --- U.S. ----, ----, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91.
 
 
 29
 The equitable remedy of cancellation will be granted in the discretion of the chancellor. Cancellation is "an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case..." Atlantic Delaine Co. v. James, 94 U.S. 207, 214, 24 L.Ed. 112; accord, Union R.R. Co. v. Dull, 124 U.S. 173, 183, 8 S.Ct. 433, 437, 31 L.Ed. 417. It is not to be granted unless it appears no injustice will be done by placing the parties in the positions they occupied before the contract or conveyance was made. 13 Am.Jur.2d, Cancellation of Instruments § 4, p. 500 (1981); see Felix v. Patrick, 145 U.S. 317, 332-333, 12 S.Ct. 862, 867, 36 L.Ed. 719. If the parties cannot be put back in statu quo, cancelation will be ordered "only where the clearest and strongest equity imperatively demands it." Grymes v. Sanders, 93 U.S. 55, 62, 23 L.Ed. 798. Thus, a person coming into a court of equity cannot demand cancellation as a matter of right, and granting such relief is within the sound discretion of the court even if the ground on which the plaintiff seeks cancellation has been clearly established. Anno: Cancellation of Instrument in Equity as a Matter of Right or of Discretion, 91 ALR 1521; 13 Am.Jur.2d, Cancellation of Instruments § 4, p. 500 (1981); see Atlantic Delaine Co. v. James, supra, 94 U.S. at 213-14, 24 L.Ed. 112; Union R.R. Co. v. Dull, supra, 124 U.S. at 182-83, 8 S.Ct. at 437. In light of the virtual impossibility of putting these parties back in statu quo after years of exploration and development,[6] we do not think the district court abused its equitable discretion in refusing to grant outright cancellation. Cf. Felix v. Patrick, supra, 145 U.S. 317, 333-34, 12 S.Ct. 862, 867, 36 L.Ed. 719.[7]
 
 
 30
 Generally, a court of equity will decline jurisdiction to grant mere compensatory damages when they are not given in addition to or incident to other special equitable relief, unless under special circumstances the exercise of such jurisdiction may be required to promote the ends of justice. I Symons, Pomeroy's Equity Jurisprudence § 237d at 437 (5th Ed. 1941) (hereinafter "Pomeroy"). There are, however, special circumstances, justifying a monetary type of award:
 
 
 31
 Where the aggrieved party shows that he is entitled to equitable relief, but the granting thereof appears to be impossible or impracticable, the court may proceed with the case, it seems, determine disputed issues, and adjust the rights and obligations of the parties, awarding damages in lieu of the desired equitable remedy.
 
 
 32
 Pomeroy, § 237e at 438; accord, 27 Am.Jur.2d, Equity § 115 at 641 (1981); Anno: Power of Equity to Require Acceptance of Damages in Lieu of Injunctive Relief Asked, 105 A.L.R. 1381.[8] We are persuaded that the trial judge had the power to exercise his discretion to provide for the payment of the adjusted bonuses as he did in this equitable action.
 
 B.
 
 33
 The lessee defendants vigorously challenge the basis on which the trial judge determined the amount of the increased bonuses. They say that Mr. Reese's Exhibit 13-B and his testimony were not a competent opinion of what bids should have been, that they were only statements of what he would have recommended to clients as bids, that his statements were inadmissible insofar as they indicated recommended bids at times other than the time of the actual lease sales, and that they did not show what bids would have been had notice been given in the manner which the trial court held proper. (Brief and Answer Brief for Appellees Amoco, et al. 32-33). In arguing for cancellation instead of the remedy chosen, the Tribe contends that Reese's testimony and its Plaintiff's Exhibit 13-B showed that the BIA's inadequate notice procedures here resulted in economic harm to the Tribe, but were not sufficient to establish the amount of bonuses which should have been paid. (Appellant's Reply Brief at 49-50).
 
 
 34
 We disagree. Mr. Reese's testimony demonstrated an ample basis for the trial judge in his discretion to accept Mr. Reese's testimony as an expert and Plaintiff's Exhibit 13-B. His testimony showed that he had qualifications as a geologist with experience in the area for many years with different companies, that he was an officer with Rijon Oil Company which had bid on Navajo lands, and that he had prepared reserve studies on the San Juan basin. (VII R. 150-153; VIII R. 7-9). He referred to consideration of isopach maps and geological horizons involved. (VIII R. 37-38). Plaintiff's Exhibit 13-B was admitted as what Mr. Reese would have recommended as bids, based on the witness's background, "his expertise is his feel for this area." (VIII R. 39-40).
 
 
 35
 We are satisfied that there was no error in the admission of the exhibit or Reese's testimony. In addition, Mr. Reese later testified he would himself have bid his recommended prices. (VIII R. 72). It is true that there were numerous witnesses for the companies who testified the bids made were fully adequate and they contradicted Mr. Reese's testimony. This, however, was all part of the evidence the trial court considered; it did not prevent the judge from considering and accepting Reese's testimony and exhibit.
 
 
 36
 As noted, the trial judge adjusted the figures to 60% of Reese's recommendations, which appeared in the appendix to the district court's opinion. We are satisfied that the ultimate finding of damages based on the whole of the evidence was not clearly erroneous, Pullman-Standard v. Swint, --- U.S. ---, ---, 102 S.Ct. 1781, 1790-91, 72 L.Ed.2d 66, and that the remedy fashioned was not an abuse of discretion.
 
 C.
 
 37
 We should consider one further issue concerning the provision made by the trial court for adjusted bonus payments. The lessee defendants also claim in their cross appeal that the trial court erred by shifting the burden of proof onto them to show that violation of the notice regulation did not result in harm to the Tribe. They cite the "rule of prejudicial error" in the APA, 5 U.S.C. § 706, and argue that the burden of showing that prejudice resulted is on the party claiming injury from the erroneous rulings. See NLRB v. Seine & Line Fishermen's Union, 374 F.2d 974, 981 (9th Cir.), cert. denied, 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 261.
 
 
 38
 At the time that the district judge denied the Tribe's motion for summary judgment he stated that there had been a technical violation of the notice provisions of the regulations, 25 CFR § 171.3; that however, this did not warrant a grant of summary judgment; and that
 
 
 39
 I am going to require with reference to these technical violations, I'm going to require the defendants to show at trial that there has been no adverse effect on the Indian interest due to the violations. That is, I will permit them to do that. I won't require it. I will permit them to do that if they would meet the contention that the leases should be cancelled for these violations.
 
 
 40
 Also I will permit, of course, the defendants to show, if they can, laches in this case, so the Motion for Summary Judgment will be denied. (Emphasis added).
 
 
 41
 (III J.App. A-317). Again, in his Memorandum Opinion, 546 F.Supp. at 576, the judge explained his reasons for his position on the showing by the companies:
 
 
 42
 However, it was also felt that having carried the burden of establishing the violations, and having made out a prima facie case of harm to its interests from lower bonus bids, the Tribe should not be required to prove the causal connection. In Gray, the court said:
 
 
 43
 Actions by the local agency contrary to the regulations and contrary to the best interest of the Indian do not create a vested right in the lease. Agents of the government must act within the bounds of their authority; and one who deals with them assumes the risk that they are so acting. (emphasis added) 395 F.2d at 537.
 
 
 44
 Here, the risk is cancellation of oil and gas leases. In order to save their leases from such a remedy, the Court has allowed defendants every opportunity to show no violation of regulations and no harm to Indian interests. Presumably, the lessee companies are on notice of matters in the United States Code and regulations, so no unfairness results when defendants are given the burden of proof with respect to these matters. Another rationale for shifting the burden onto defendants can be found in 25 U.S.C. Section 194, which states that the "white man" has the burden of proof in matters involving land where the Indian has established a presumption of title to the land in himself. The Court realizes that this statute is not at issue in this lawsuit, but it is included here merely for purposes of analogy. (Emphasis added).
 
 
 45
 (II J.App. A-272-73).
 
 
 46
 We find no error in the ruling of the trial court on the burden of proof. The court's statements point to the fact that in response to the claim of violations of the notice regulation, which the court upheld as being established, the companies were permitted to prove that there was no adverse effect on the Tribe's interests due to the violations. We feel the ruling was a just and fair assignment of the burden of proving lack of injury resulting from the bidding, as a means of meeting the established violation of the notice regulations. The knowledge and availability of information on the side of the bidders in the oil and gas business is one factor favoring the ruling. Another is the underlying policy of protection of the interests of the Indians for whose benefit the regulation was adopted. As the Supreme Court has stated:
 
 
 47
 This burden-shifting principle is not new or novel. There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, "is merely a question of policy and fairness based on experience in the different situations." 9 J. Wigmore, Evidence § 2486, at 275 (3d ed. 1940).
 
 
 48
 Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 209, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548.
 
 
 49
 The ruling is further consistent with the rule generally assigning the burden of proof to one asserting an affirmative allegation. 9 J. Wigmore, Evidence § 2486, at 288 (Chadbourn rev. 1981). Fed.R.Civ.P. 8(c) sets forth numerous affirmative defenses including laches, which was referred to in the trial judge's statement quoted above. (III. J.App. A-317). The general catch-all phrase in Rule 8(c) on affirmative defenses encompasses "any other matter constituting an avoidance or affirmative defense."
 
 
 50
 Thus, in determining what defenses other than those listed in Rule 8(c) must be pleaded affirmatively, resort often must be had to considerations of policy, fairness, and in some cases probability...
 
 
 51
 5 Wright, Miller & Kane, Federal Practice and Procedure, § 1271, at 313 (1982).
 
 
 52
 In the pre-trial order the statements of both sides raised the matter. The statements of the Tribe's claims included the allegation that the violations of the regulations, specifically 25 C.F.R. § 171.3, resulted in non-competitive bidding in the leasing of the lands "for less than their true value." (II J.App. A-189-90). In the lessee defendants' claims concerning the regulation violation issue it was stated that "(a)ny lease sale regulation violation caused no injury to the Tribe entitling it to maintain this action, and the Tribe therefore, lacks standing to maintain this action." (II J.App. A-190). Thus there was a reasonable basis for treating the lessee defendants' assertion of no injury to the Tribe as an affirmative defense on which they bore the burden of proof.
 
 
 53
 Nor can we agree that "the rule of prejudicial error" of 5 U.S.C. § 706 requires reversal. The considerations of policy and fairness outlined above are the predominant factor and they support the trial court's handling of this trial matter. We are not persuaded that the violation of the notice regulation flawing the bidding for the leases fits within the § 706 pattern of prejudicial error. The violation did not occur as a mere error in hearing procedures as in N. L. R. B. v. Seine & Line Fishermen's Union, supra, 374 F.2d at 981.
 
 
 54
 We are persuaded that, in light of considerations of fairness and of the policy favoring protection of the Indian, it was not error to assign to the companies the burden of showing no injury to the Indian interests in responding to the established violation of the notice regulations.
 
 
 55
 In sum, we find no error in the trial judge's procedure nor in his determination of the appropriate equitable remedy for the wrong to the Tribe by the violation of the regulation on notice of sales of Indian leases.
 
 III
 
 56
 The equitable defenses to the claim of violation of the
 
 
 57
 regulation on notice procedures
 
 
 58
 The lessee defendants argue that their defenses of laches, estoppel, waiver, and unclean hands bar any relief for the Tribe on the claimed violation of the notice regulation. (Brief and Answer Brief for Appellees Amoco, et al. at 37). In support of this proposition they point to a delay of three-and-one-half to six years before suit was brought, substantial investment in exploration and development by the lessees, and prior lease sales of Tribal lands under the same notice procedures.
 
 
 59
 It is true that the doctrine of laches is vigorously enforced in cases involving mineral properties. "Persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced." Patterson v. Hewitt, 195 U.S. 309, 321, 25 S.Ct. 35, 38, 49 L.Ed. 214; accord, Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 592-93, 23 L.Ed. 328. Nevertheless, the issue of laches depends on whether "equitable relief cannot be afforded without doing injustice." Penn Mut. Life Ins. Co. v. Austin, 168 U.S. 685, 698, 18 S.Ct. 223, 228, 42 L.Ed. 626. Laches will bar relief "only where the enforcement of the asserted right would work injustice." Hoehn v. Crews, 144 F.2d 665, 671 (10th Cir.), aff'd on other grounds, 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870. Thus laches must be determined in light of the particular remedy fashioned.
 
 
 60
 The district court rejected the equitable defenses. The court stated that "defendants will not ... be unduly harmed or prejudiced by the remedy employed by this court." 546 F.Supp. at 580. As with other equitable defenses, the existence of laches "is a question primarily addressed to the discretion of the trial court." Burnett v. New York Central R.R. Co., 380 U.S. 424, 435, 85 S.Ct. 1050, 1058, 13 L.Ed.2d 941; accord, Gardner v. Panama R.R. Co., 342 U.S. 29, 30-31, 72 S.Ct. 12, 13, 96 L.Ed. 31; Homestake Mining Co. v. Mid-Continent Exploration Co., 282 F.2d 787, 797 (10th Cir.). In light of the remedy fashioned and the circumstances before him, the district judge did not abuse his discretion when he concluded that the lessee defendants failed to establish, as a complete bar, these equitable defenses to the Tribe's claim grounded on violation of the notice regulation.
 
 IV
 The NEPA claim
 
 61
 As noted, the trial court held that the Tribe's claim of a NEPA violation was barred by laches and the doctrine of unclean hands. The Tribe had prayed for cancellation of the nonproducing leases, and an order directing the Secretary to prepare an environmental impact statement (EIS) for producing leases and to recommend changes in the lease terms based thereon. Due to its laches and unclean hands ruling the court did not reach the questions of whether the oil and gas leasing activity constituted major federal action significantly affecting the quality of the human environment and whether an EIS was required.
 
 
 62
 The defense of laches is available in environmental litigation but is disfavored because of the interests of the public in environmental quality and because the agency would escape compliance with NEPA if laches were generally applied, thus defeating Congress' environmental policy. Concerned Citizens on I-190 v. Secretary of Transportation, 641 F.2d 1, 7-8 (1st Cir.); Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 779 (9th Cir.). The question whether laches bars an action depends on the facts and circumstances of each case. The issue is primarily left to the discretion of the trial court, but that discretion is, of course, confined by recognized standards. Coalition for Canyon Preservation v. Bowers, 632 F.2d at 779. The trial court must find (a) unreasonable delay in bringing suit by the party against whom the defense is asserted and (b) prejudice to the party asserting the defense as a result of this delay.[9] Environmental Defense Fund v. Tennessee Valley Auth., 468 F.2d 1164, 1182 (6th Cir.); accord, Environmental Defense Fund v. Alexander, 614 F.2d 474, 478 (5th Cir.), cert. denied, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146; Bradley v. Laird, 449 F.2d 898, 902 (10th Cir.).
 
 
 63
 Mere lapse of time does not amount to laches. Bradley v. Laird, 449 F.2d at 902. When Government action is involved, members of the public are entitled to assume public officials will act in accordance with law. Environmental Defense Fund v. Alexander, 614 F.2d at 479. Laches may be found, however, where a party, having knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own. Alexander v. Phillips Petroleum Co., 130 F.2d 593, 605 (10th Cir.). A party must exercise reasonable diligence in protecting his rights. See Holmberg v. Armbrecht, 327 U.S. 392, 396-97, 66 S.Ct. 582, 584-85, 90 L.Ed. 743; Cady v. Morton, 527 F.2d 786, 792 (9th Cir.).
 
 
 64
 The record supports the finding of unreasonable delay by the Tribe in asserting its NEPA claim as a ground for attacking the leases. The Tribe commenced the action in April 1976. The four lease sales were held beginning in April 1970 and concluding in September 1972. During the period of lease sales, the law was unclear as to applicability of NEPA to the approval of lease sales by the BIA. In November 1972, however, this court held that NEPA was applicable to Government approval of a 99-year lease of Indian lands in New Mexico. Davis v. Morton, 469 F.2d 593, 597-98 (10th Cir.). It was more than three years after that decision when the Tribe brought this action.
 
 
 65
 The Tribe asserts that there was evidence showing that the Tribe first acquired knowledge of its NEPA claims in October 1975 and that the defendants offered no evidence to the contrary. Harold Tecube, an agency realty specialist for the BIA who had responsibility for oil and gas activity and its environmental consequences during the relevant time periods herein, did testify that the Tribe first became aware of the ramifications of NEPA with regard to these leases in October 1975 at a meeting of the Tribal Council. (VII J.App. A-961-63, A-978-80). Tecube also testified that in the years from 1970 to 1974 the Tribe was dependent on the Bureau to answer questions relating to oil and gas development. (VII J.App. A-970). The latter testimony was corroborated by Thomas Olson, the Tribe's general counsel from 1965 to 1973, who stated that he did not represent the Tribe on oil and gas or NEPA matters, and that during his representation the Tribe relied heavily on the BIA and United States Geological Survey and had no independent oil and gas consultants. (VII J.App. A-939, A-951, A-953-54). The Tribe thus argues that its ignorance of the NEPA violation was attributable to its reliance on the BIA. The Tribe points to the fiduciary duty owed by the United States to protect Indian land and concludes that the suit was timely filed. (Appellant's Brief in Chief at 67-68; Appellant's Reply Brief at 27-28).
 
 
 66
 We disagree. The Tribe cannot rely on its lack of knowledge of the applicability of NEPA to the approval of lease sales. Laches does not depend on the subjective awareness of the legal basis on which a claim can be made. Environmental Defense Fund v. Alexander, 614 F.2d at 479; Alexander v. Phillips Petroleum Co., 130 F.2d at 606. The Tribe clearly had knowledge of the Secretary's approval of the lease sales at the time of the sales, and the NEPA ruling in Davis v. Morton was made in November 1972. While the Tribe may not have known of the BIA's failure to comply with NEPA until October 1975, the Tribe would have acquired this knowledge had it exercised the proper diligence.[10]
 
 
 67
 The trial court also found that the delay in bringing suit resulted in prejudice to the lessee defendants, stating (546 F.Supp. at 582):
 
 
 68
 (T)he delay resulted in prejudice to the lessee defendants. Because they had no notice that anything was amiss with their Jicarilla leases until the institution of this suit, they have invested well over $12 million in the leases in the form of bonus payments, rentals, administrative overhead costs, plus exploration, drilling and production costs. Were they to lose their leases, much of that investment would be lost, not to mention the loss of future profits based on investments already made.
 
 
 69
 The Tribe does not dispute the finding that the lessee defendants made some expenditures prior to the bringing of this suit.
 
 
 70
 The Tribe says that the greater part of the monies spent by the lessee defendants has been for bonuses and delay rentals, that these contractual liabilities were incurred by defendants at the time of the lease sales and are not dependent on the Tribe's inaction in bringing suit, and that these expenditures could not have been made in reliance on the Tribe's inaction, citing Cady v. Morton, 527 F.2d 786, 792-93 (9th Cir.). We agree that the lease bonuses should not be controlling. These monies were paid before there was any reliance by the lessee defendants on the inaction of the Tribe. Id. The same can be said as to those rentals paid before an unreasonable delay in the assertion of the Tribe's claim occurred. We feel it is clear, however, that the same result would have been reached by the court based on other expenditures and the loss of future profits, if cancellation on NEPA grounds occurred. The record amply supports the laches ruling.[11] See Rochester v. United States Postal Service, 541 F.2d 967, 977-78 (2d Cir.).
 
 
 71
 Likewise, the trial court did not err in its application of the unclean hands doctrine. At approximately the same time the Tribe filed this suit, it entered into three joint venture agreements for oil and gas development on the reservation. The largest of these developments was for 5000-5500 acres; the smallest was for 640 acres. (V J.App. A-648-49; see Appellant's Reply Brief at 15). The economic benefits of these agreements are more attractive to the Tribe than the lease terms at issue. (V J.App. A-689). The Tribe, however, did not seek to enforce NEPA compliance with respect to the joint ventures. Environmental "reports" were prepared on the joint ventures for the benefit of the Tribe. They were not prepared by BIA personnel, but by private environmental experts approved by the oil companies and the Tribe. (See XII R. 146-150). The Tribe, however, did not ask the BIA to prepare an EIS with respect to the joint ventures, (VII J.App. A-935), nor did it file suit against the companies which are parties to the joint venture agreements to secure compliance with NEPA as it did against the lessee defendants here.
 
 
 72
 We feel the trial judge could reasonably find, as he did, that the Tribe was not motivated by good faith concerns for the environmental impact of oil and gas development, that it was motivated by its desire to obtain the maximum possible compensation for the development (but see V J.App. A-684-94), and that it was unjust and inequitable to allow the Tribe to use NEPA as a device solely for economic gain. 546 F.Supp. at 584.
 
 
 73
 In sum, we conclude that the district judge did not err in holding that the Tribe's NEPA claim was barred by the laches and unclean hands doctrines.
 
 V
 
 74
 Tolling of the terms of the leases and the rental payments
 
 
 75
 The Tribe next argues that the trial court erred in tolling certain provisions of the leases during the pendency of this suit. The court tolled the ten year primary term of the leases from the date each lessee was served with process to the date of judgment. The court also held that the annual rentals need not be paid during this period on leases which had no production or on leases on which production had ceased during this period. The Tribe makes several arguments challenging these holdings.
 
 
 76
 First, the Tribe argues that the trial court did not have the power to toll the primary terms of the leases since this would in effect be altering the provisions of the statute, 25 U.S.C. § 396a, that sets the maximum primary term of the leases at ten years. The district court held that a court of equity does have such power, stating, 546 F.Supp. at 584:
 
 
 77
 Where plaintiff has placed a cloud on the title of a leasehold by seeking judicial cancellation of the lease, a court may, in fairness to the lessee, toll the running of the lease terms. Continental Oil Co. v. Osage Oil & Refining Co., 69 F.2d 19 (10th Cir. 1934). The filing of this lawsuit, while it did not prevent lessees from activities on their leases, did place a cloud on the title of the leaseholds, and, in fact, discouraged several of the companies from proceeding fully with development plans.
 
 
 78
 While it is true that 25 U.S.C. § 396a provides that Indian reservations or lands can be leased "for terms not to exceed ten years and so long thereafter as minerals are produced in paying quantities," we feel this section was not intended to exclude the equitable application of the tolling doctrine. There is no indication that Congress in using the word "terms" did not simply intend to set the maximum primary term for which such lands could be leased, or that it intended to break with historic principles of equity practice such as tolling. An appeal to the equity jurisdiction of the federal district courts, such as the suit here to cancel leases, is an appeal to the sound discretion which guides the determinations of courts of equity. Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754; see Weinberger v. Romero-Barcelo, --- U.S. ----, ----, 102 S.Ct. 1798, 1802-1807, 72 L.Ed.2d 91. Thus we conclude that Congress in enacting 25 U.S.C. § 396a did not intend to bar the application of such equitable doctrines as tolling.
 
 
 79
 Second, the Tribe asserts that the application of tolling was improper under the facts of this case. The Tribe argues that tolling is proper where a lessor places a cloud on the title of the lessee or prevents the lessee from producing, only if the lessor's actions were "wrongful." The Tribe says that its actions in bringing suit to cancel the leases cannot be characterized as "wrongful" because its claim of violation of the regulation on the notice procedures was upheld by the trial court.
 
 
 80
 The general rule runs counter to this argument. When a lessor actively asserts to a lessee that his lease is terminated or subject to cancellation, the obligations of lessee to lessor are suspended during the time such claims of forfeiture are being asserted. Morrison Oil and Gas Co. v. Burger, 423 F.2d 1178, 1182-83 (5th Cir.); Twyford v. Whitchurch, 132 F.2d 819, 821 and n.6 (10th Cir.); Continental Oil Co. v. Osage Oil & Refining Co., 69 F.2d 19, 23-24 (10th Cir.), cert. denied, 287 U.S. 616, 53 S.Ct. 17, 77 L.Ed. 535; 2 E. Kuntz, Oil and Gas 324-26 (1964). While there was some mention of the element of wrongfulness in Continental Oil, the case relied on by the district court, the case is not premised on "wrongful" conduct. It is true that Libby v. de Baca, 51 N.M. 95, 179 P.2d 263, 265, cited by the Tribe, does support its position. The case, however, is not controlling here because we are concerned with oil and gas leases on Indian lands which are governed by federal law.11a Moreover, we do not find the Libby case persuasive. The purpose of tolling is not to punish the lessor for asserting his claim but to restore the parties to the position they occupied originally. See 2 E. Kuntz, Oil and Gas at 326-27; H. Williams and C. Meyers, Oil and Gas Law § 604.7, p. 82 (1980). The tolling remedy was applied here in accord with this principle and we conclude that the district court did not err in thus tolling the primary terms of the leases.
 
 
 81
 We have noted one further point concerning the length of the tolling period which should be mentioned. The district court defined the tolling period in a manner which extends the period of the primary leases for a term equivalent to the period from the service of process upon the individual lessees to the date of judgment entered.11b This provision does not deal with the question of tolling during appellate or certiorari proceedings. We do not, however, decide whether the tolling period should be further extended because the issue was not covered by the district court and because the point is not discussed by the parties on appeal.11c Under these circumstances, we feel we should leave this matter to the district court to consider. Thus, we vacate that part of the district court's opinion and judgment which defines the tolling period and remand the case for the trial court to consider whether the tolling period should be extended to include the pendency of this appeal and any certiorari proceedings.
 
 
 82
 The Tribe also contends that the trial court erred in not requiring the lessee defendants to pay the annual rentals during the periods the leases' primary terms were tolled. The Tribe argues that the district judge's holding is directly contrary to our decision in Twyford v. Whitchurch, 132 F.2d 819 (10th Cir.). (Appellant's Brief in Chief at 73-75; Appellant's Reply Brief at 35).
 
 
 83
 We must agree that the district court erred in one respect. While a lessee is excused from paying rentals during a period when a lessor is actively asserting that the lease is terminated or subject to cancellation, the more persuasive authorities have stated that the lessee is not relieved from liability for payment of such rentals if the validity of the lease is subsequently established. 3 E. Kuntz, Oil and Gas at 200-201; see Twyford, 132 F.2d at 822.[12] But see Mobil Oil Corp. v. Kelley, 353 F.Supp. 582, 586 (S.D.Ala.), aff'd, 493 F.2d 784 (5th Cir.), cert. denied, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296; but cf. Gulf Oil Corp. v. Morton, 493 F.2d 141, 150 (9th Cir.). Under this reasoning a lessee need not pay rentals while the lessor is asserting that the lease has terminated. The lessee, however, is not relieved of the liability for these payments. If the lease is subsequently held valid, the lessee is then liable for the payments and must pay them within a reasonable time.
 
 
 84
 This result is appropriate under the facts of the case. The Tribe's claim that the Secretary violated the notice regulations was upheld by the district court, and we agree with that holding. While the remedy of cancellation sought by the Tribe was denied, the claim of such a violation was upheld and damages were awarded. To deny the rentals to the Tribe during the pendency of the action when the Tribe was successful in its basic position on the notice regulation would be inequitable. Either the Tribe or the lessee defendants will suffer the loss resulting from the fact that lessees were effectively prevented from developing the leased mineral estates. If the lessee defendants are not required to pay the rentals, the Tribe would suffer the loss of rentals and the potential loss of royalty resulting from future production. On the other hand, if rentals are mandated, the lessees would be required to pay rentals for a period during which exploration and development were obstructed. They would thus be paying rentals and receiving only the right to develop the properties in the future.
 
 
 85
 Balancing the equities we conclude that the trial court should have required the lessee defendants to pay the rentals at issue. The loss resulting from delay must fall on one party or the other, and here, where the Tribe was successful in challenging the procedure under which the leases were issued, the loss should be borne by the defendants. To hold otherwise would unduly penalize the Tribe for asserting its rights.
 
 
 86
 Thus we hold that the trial court erred in not requiring the rentals to be paid. On remand, the trial court should modify its judgment to provide for payment of the rentals to the Tribe from the escrow accounts into which they have been paid, and by a judgment therefor as to any not paid into the escrow accounts. We conclude that the Tribe is entitled to such recovery of the rentals, even if a lessee defendant elects not to pay the adjusted lease bonus discussed in Part II, since the lessee defendant's right to retain its lease is being upheld against the Tribe's suit for cancellation, although on the condition of payment of the adjusted bonus. While we agree with the principle of tolling the primary terms of the leases, we vacate the trial court's ruling on this issue and remand for a determination whether the tolling period should be extended to include the pendency of this appeal and any certiorari proceedings.
 
 VI
 The counterclaims
 
 87
 All of the lessee defendants filed counterclaims against the Tribe for its action in filing this suit. The theories of recovery include a general inequitable or wrongful action by filing suit, breach of lease by seeking administrative cancellation and by filing suit, and violation of various provisions of the Indian Civil Rights Act (ICRA), 25 U.S.C. §§ 1301 et seq. The lessee defendants seek monetary relief, claiming as damages the bonus payments, delay rentals, expenses associated with the lease sales, drilling and exploration expenses, interest, and costs, inter alia.
 
 
 88
 The Tribe responded by a motion to dismiss the counterclaims, arguing failure to join an indispensable party, failure to state a claim on which relief can be granted, and lack of ripeness. (I J.App. A-78). That motion was denied. (I J.App. A-80). The Tribe later raised tribal sovereign immunity as a bar to the counterclaims in its replies (e.g., I R. 231, 234, 237, 240, 243, 245), and in a motion to dismiss the counterclaims.
 
 
 89
 The district court indicated that it would reconsider the previous order denying the Tribe's motion to dismiss all counterclaims and entered orders dismissing all counterclaims. (II J.App. A-303-05). The court granted motions by Gulf Oil Corp. and Southland Royalty Co. to dismiss their counterclaims. The court held that, to the extent that the remaining counterclaims were predicated upon cancellation,[13] they would be moot if the lessee decided to pay the adjusted bonus for each lease and thus avoid cancellation. 546 F.Supp. at 572 & n.2. The court further held that the Tribe's sovereign immunity barred adjudication of the counterclaims, whether that adjudication might result in an affirmative money judgment against the Tribe or merely in equitable recoupment of part or all of the adjusted bonus payments. 546 F.Supp. at 587.
 
 
 90
 The lessee defendants appeal only from that portion of the court's counterclaim decision which is based on sovereign immunity. (Brief and Answer Brief of Appellees Amoco, et al. at 72-75; Reply Brief for Appellees Amoco, et al. at 30-34). They argue that, by filing suit in federal court, the Tribe waived its sovereign immunity with respect to counterclaims which are reasonably incident to the suit. It is also claimed that the ICRA provides a waiver of immunity.
 
 
 91
 As the Supreme Court recently reiterated,
 
 
 92
 Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.
 
 
 93
 Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106. Indian Nations are exempt from suit without Congressional authorization, United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894, or waiver by the Tribe, Merrion v. Jicarilla Apache Tribe, 617 F.2d 537, 540 (10th Cir.) (en banc ), aff'd, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21(1982). Although the precise limits of this tribal immunity are not clear, see Note, In Defense of Tribal Sovereign Immunity, 95 Harv.L.Rev. 1058, 1059-69 (1982), it is generally co-extensive with that of the United States.[14] Ramey Construction Co. v. Apache Tribe of the Mescalero Reservation, 673 F.2d 315, 319-20 (10th Cir.).
 
 It is recognized, however, that
 
 94
 when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment-arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the "same transaction or occurrence test" nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff.
 
 
 95
 Frederick v. United States, 386 F.2d 481, 488 (5th Cir.); accord, Guaranty Trust Co. v. United States, 304 U.S. 126, 134, 58 S.Ct. 785, 789, 82 L.Ed. 1224; United States v. Martin, 267 F.2d 764, 769 (10th Cir.); Fidelity & Cas. Co. v. Reserve Ins. Co., 596 F.2d 914, 917 & n.1 (9th Cir.); In re Greenstreet, Inc., 209 F.2d 660, 663 (7th Cir.); 3 Moore's Federal Practice P 13.28; see Bull v. United States, 295 U.S. 247, 261-62, 55 S.Ct. 695, 700, 79 L.Ed. 1421; United States v. Ringgold, 33 U.S. (8 Pet.) 150, 163-64, 8 L.Ed. 899; cf. National City Bank of N. Y. v. Republic of China, 348 U.S. 356, 361-62, 75 S.Ct. 423, 427, 99 L.Ed. 389 (foreign sovereign). This doctrine equally applies to Indian tribes. See United States v. United States Fidelity & Guaranty Co., supra, 309 U.S. at 511, 60 S.Ct. at 652.
 
 
 96
 The trial judge held that the counterclaims must be dismissed, that they did not fit within the equitable recoupment exception to the sovereign immunity doctrine, that they did not arise out of the same transaction as the Tribe's amended complaint. The judge pointed out that the part of the complaint on which the Tribe would recover is that alleging violations of procedural requirements by the Secretary in the early 1970's prior to signing of the leases; that the counterclaims aver wrongful action by the Tribe in filing and maintaining its suit; and that no violation of the leases was found, with only violation of the federal regulations regarding notice of lease sales being found.
 
 
 97
 We agree. The analysis by the trial court is persuasive that the counterclaims do not arise out of the same transaction or occurrence so as to come within the equitable recoupment principles discussed in Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421, or Frederick v. United States, supra, 386 F.2d at 488.[15] We have considered the general statements in United States v. Martin, 267 F.2d 764, 769 (10th Cir.) on waiver, by bringing suit, of governmental immunity to permit adjudication of all matters reasonably incident to the action and counterclaims thereon. We conclude, however, that the trial court's reasoning demonstrates that, even under Martin, there was no waiver here so that these counterclaims can be pursued against the Tribe. Martin itself points out that the Government "does not ipso facto relax its traditional immunity from suit by becoming a suitor in the courts." The limitations as to the same subject matter and matters and issues reasonably incident thereto are recognized. Id. at 769. The trial court concluded that the counterclaims, based on the Tribe's action in bringing and maintaining the 1976 suit, do not arise out of the same transaction as the Tribe's amended complaint, which was grounded on the claim of 1970, 1971, and 1972 violations of the requirements on notice of lease sales. Thus the counterclaims here do not come within the test of Martin and the general rule on the requirement that such counterclaims arise out of the same transaction or occurrence in order for there to be a waiver of sovereign immunity, permitting entertainment of the counterclaims.
 
 
 98
 This brings us to the question whether the counterclaims for alleged violations of the Indian Civil Rights Act are barred by the Tribe's immunity. Only the amended counterclaims of Mesa Petroleum (Counts IV-VI, II R. 368-72), and Dugan Production (Counts VI-VIII, II R. 533-35), specifically alleged violations of the ICRA. They claimed that by filing this suit and by seeking administrative cancellation of the leases, the Tribe deprived them of liberty or property without due process of law (II R. 369, 533; see 25 U.S.C. § 1302(8)), took private property for a public use without just compensation (II R. 370, 534; see 25 U.S.C. § 1302(5)), denied them equal protection of the law[16] (II R. 371, 535; see 25 U.S.C. § 1302(8)), and violated the prohibition against a bill of attainder, (II R. 372, 535; see 25 U.S.C. § 1302(9)). The district court held that the ICRA had not waived the Tribe's sovereign immunity to these counterclaims, citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106, 546 F.Supp. at 587. We agree. In Santa Clara Pueblo, the Court held that, since Congress expressly granted federal jurisdiction only for habeas corpus suits, 25 U.S.C. § 1303,
 
 
 99
 (n)othing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief.
 
 
 100
 436 U.S. at 59, 98 S.Ct. at 1677. Therefore, the Court continued, "suits against the tribe under the ICRA are barred by its sovereign immunity from suit." Ibid.
 
 
 101
 The companies argue that their ICRA claims fall within the federal courts' jurisdiction under our decision in Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes, 623 F.2d 682 (10th Cir.), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847. There plaintiffs sought relief under the ICRA from tribal action which blocked all access to their land and "for all practical purposes confined" them there. 623 F.2d at 684. This court emphasized that, in contrast to the situation in Santa Clara Pueblo, the dispute was not "strictly an internal one between tribal members and the tribal government", and that the non-Indian plaintiffs had demonstrated that they had "no remedy within the tribal machinery nor with the tribal officials in whose election they cannot participate." 623 F.2d at 685.
 
 
 102
 This controversy between the Tribe and the lessee defendants does not involve claims of "particularly egregious allegations of personal restraint and deprivation of personal rights..." See Ramey Constr. Co. v. Apache Tribe of the Mescalero Reservation, 673 F.2d 315, 319 n.4 (10th Cir.); Shubert Constr. Co. v. Seminole Tribal Housing Authority, 490 F.Supp. 1008, 1010 (S.D.Fla.). Indeed it is difficult to visualize these counterclaims as coming within the framework of the Indian Civil Rights Act. And Santa Clara Pueblo, 436 U.S. at 60, 98 S.Ct. at 1678, reminds us that a proper respect for tribal sovereignty itself and for the plenary authority of Congress in this area "cautions that we tread lightly in the absence of clear indications of legislative intent (to waive tribal sovereign immunity)."
 
 
 103
 In sum we are convinced that the trial court properly dismissed the counterclaims.
 
 VII
 Costs
 
 104
 Lastly, we consider the Tribe's claim that the trial court erred in not awarding costs to the Tribe. (Appellant's Brief in Chief 76; Appellant's Reply Brief 35-36). The lessee defendants respond that the Tribe never filed a bill of costs in the district court, that the court has not denied costs to the Tribe, and that this court is therefore without jurisdiction on the issue of costs accrued in the district court. (Brief and Answer Brief for Appellees Amoco et al. 75). The Secretary takes no position on this issue.
 
 
 105
 The district court did not indicate in its opinions, orders, or final judgment which parties should be awarded costs. Fed.R.Civ.P. 59(d) provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs ..." See also 28 U.S.C. § 1920. There is no indication in the Federal Rules or the statute as to when motions for costs are timely. Local Rule 15(b) of the United States District Court for the District of New Mexico does, however, provide as follows:
 
 
 106
 b. Motion to Tax Costs. Within 20 days after final judgment, the party recovering costs shall file with the Clerk a motion to tax costs. Any party failing to file a cost bill within 20 days will be deemed to have waived costs....
 
 
 107
 From our record there is no indication that any party made a motion for costs.[17] Thus the district court has not made any determination on the matter. Disposition of any motion for costs and application of the local rule would be matters for the trial judge in the first instance.[18] Kallay v. Community National Life Ins. Co., 52 F.R.D. 139, 140-41 (N.D.Okl.). In any event, we have no issue which is ripe for a determination as to such costs and therefore express no opinion on the subject.
 
 VIII
 Conclusion
 
 108
 In sum, we are in agreement with the major portion of the rulings and the thorough opinions of the district court on an equitable disposition of this difficult case. We disagree only with the ruling on the tolling of the rental payments, which is reversed, and the judgment should be modified to provide for recovery of those payments by the Tribe. In addition, the opinion and judgment defining the tolling period for the primary leases is vacated and the trial court should consider on remand whether the tolling of the primary terms of the leases should be extended through appeal and any certiorari proceedings. In all other respects, the judgment and orders of the district court are affirmed and the cause is remanded for further proceedings in accord with this opinion.
 
 
 109
 IT IS SO ORDERED.
 
 BARRETT, Circuit Judge, concurring:
 
 110
 I fully concur in the opinion authored by Judge Holloway. I write separately to express my views on the issues of reformation and cancellation.
 
 Reformation
 
 111
 The trial court refused to cancel the leases outright as requested by the Tribe, even while recognizing that the actions of the Secretary were in "technical" violation of federal statute and regulations. The technical violation involved inadequate notice which primarily affected the amount of bonus payments. It did not, however, affect the leases per se. It is for the above reason that the court ordered that "the Secretary cancel a lease unless, within 60 days from entry of final judgment, the particular lessee pays plaintiff Jicarilla Apache Tribe an adjusted bonus equal to the difference between the bonus actually paid and 60% of the bonus payment recommended by Val Reese in his evaluation of lease bonuses." (R., Vol. II, p. A-277).
 
 
 112
 I do not agree with the interpretations that the trial court's action must be treated as a reformation of the leases; that the trial court's action is impermissible because a court of equity cannot change the terms of a contract in the absence of fraud, accident or mistake; and that because the lease contract here is void because it is not in compliance with an express statutory provision, a court of equity cannot validate the contract.
 
 
 113
 I do not view the trial court's action as a reformation of the leases. Reformation of a lease or contract by a court of equity is proper where, through fraud or mutual mistake, the instrument fails to express the intention of the parties. Bosse v. Crowell Collier and MacMillan, 565 F.2d 602 (9th Cir. 1977); Chevron Oil Company v. Barlow, 406 F.2d 687 (10th Cir. 1969); Ohio Casualty Ins. Co. v. Callaway, 134 F.2d 788 (10th Cir. 1943). There is no contention in this case that the leases do not embody the intentions of the parties.
 
 
 114
 The position of the Tribe is that, due to the failure by the Secretary of the Interior to comply with notice requirements contained in the regulations, the leases are invalid on their face. However, and significantly, the trial court pointed out that the inadequate notice affected only and singularly the amount of the bonus payments. Bonus payments are consideration in terms of tender for execution by the lessor of the lease agreement. Bonus payments are not lease terms. The cash bonus has always been the acknowledged consideration from the lessee to the lessor for execution of the lease. While the standard oil and gas lease contains an acknowledgment by lessor of receipt of one dollar or other nominal sum as consideration for the lease, the actual bonus payment has been competitive and substantial in areas of proven oil and gas lands. Thus, bonus is generally defined as any consideration given for a lease (whose terms and covenants are negotiated) in addition to the usual royalties reserved in the lease. Generally the bonus is paid on the execution of the lease. Summers, Oil and Gas, 3A, § 586, pp. 70-89. The cash bonus, then, represents the market value of the lease apart from royalties to be paid on production and other considerations of the lease (delay rentals, for example) and is a sum generally paid on execution of the lease, or agreed to be paid at some later date, usually out of the lessee's share of the first oil produced from the land. Summers, Oil and Gas, Vol. 3A, § 571, p. 3. Thus, none of the terms of the leases in this case would have been affected had the notice requirements been strictly complied with. Therefore, I conclude that the court's action cannot be considered that of reformation.
 
 
 115
 The trial court intended to compensate the Tribe for any losses sustained by the Secretary's failure to comply with the notice requirement. The judge found that the inadequate notice affected only the bonus payments. Thus, the court ordered the lessees to pay the difference between what was actually paid and 60% of the expert witness Reese's "estimate of amount of bonus payment each lease should have generated." Reese's estimate was discounted 40% to arrive at the figure the Tribe would have received had the notice been adequate. The order was couched in classical damages terminology, and, I believe, may be accurately construed as a damages award to the Tribe. It is generally accepted that a court in equity may award damages if necessary to do complete justice. Minnis v. Intern. U., United Auto., Aerospace, etc., 531 F.2d 850 (8th Cir. 1975). This remedy was adequate and complete. There is no contention that any of the covenants in the lease agreements proper would have been any different had the proper notice been given.
 
 Cancellation of the Leases
 
 116
 The Tribe contends that the leases should be cancelled because the lease sales were conducted in violation of the regulations, thus rendering the leases invalid. As previously noted-and as found by the district court-while the notice requirements were not technically fulfilled, the leases were not affected by the violations. The bonus payments solely were affected by the inadequate notice. Because bonus payments are not included in the terms and covenants of the lease, they have no relationship to operating covenants. Thus, case law which deems a contract made in contravention of statutory provisions to be void is not applicable here. Moreover, it has been held that the technical breach of a gas lease does not necessarily require the cancellation of that lease by the Secretary of the Interior. Jicarilla Apache Tribe v. Supron Energy Corp., 479 F.Supp. 536 (D.N.M.1979) (involving the breach of a lease and not the violation of a pre-lease regulation).
 
 
 
 [1]
 The district court filed two substantial memorandum opinions: the first on February 12, 1980, (II J.App. A-264), and the second on March 10, 1980, (II J.App. A-297), which are reported at 546 F.Supp. 569. In this opinion we cite the Joint Appendix as "J.App." and the original record on appeal as "R."
 
 
 [2]
 Section 396b provides:
 Leases for oil- and/or gas-mining purposes covering such unallotted lands shall be offered for sale to the highest responsible qualified bidder, at public auction or on sealed bids, after notice and advertisement, upon such terms and subject to such conditions as the Secretary of the Interior may prescribe. Such advertisement shall reserve to the Secretary of the Interior the right to reject all bids whenever in his judgment the interest of the Indians will be served by so doing, and if no satisfactory bid is received, or the accepted bidder fails to complete the lease, or the Secretary of the Interior shall determine that it is unwise in the interest of the Indians to accept the highest bid, said Secretary may readvertise such lease for sale, or with the consent of the tribal council or other governing tribal authorities, a lease may be made by private negotiations: ... (Emphasis added).
 
 
 [3]
 Two sample tract descriptions included in the long-form notice read:
 
 
 [6]
 Tract No. 6 when surveyed will be described as follows:
 sec. 29: All
 sec. 30: All (fractional)
 sec. 31: All (fractional)
 sec. 32: All
 containing approximately 2,502 acres
 
 
 [11]
 sec. 5: Lots 1, 2, 3, 4, S 1/2 N 1/2, S 1/2 All
 (irregular)
 sec. 6: Lots 1, 2, 3, 4, 5, 6, 7, SE 1/4 NW 1/4, S 1/2 NE 1/4, E 1/2 SW 1/4, SE 1/4 All
 (irregular)
 sec. 7: Lots 1, 2, 3, 4, E 1/2 W 1/2, E 1/2 All
 (fractional)
 sec. 8: All
 containing 2,561.60 acres
 (I J.App. A-32).
 
 
 [4]
 The trial court declared the Secretary's notice procedure "to be in violation of federal statute and regulations." 546 F.Supp. at 580; II J.App. A-277. The court's discussion and the Tribe's arguments focus, however, on the regulation's publication procedures which implemented the "notice and advertisement" requirement of § 396b, and not on failure to comply with any specific direction on notice in the statute
 In addition to the defect in notice, the Tribe asserts that before the tribal council gave the Secretary its authorization to hold a sale, it should have been informed as to which particular tracts would be put up for bidding. (Appellant's Brief in Chief at 8, 36-37; Appellant's Reply Brief at 46; see Brief and Answer Brief for Appellees Amoco et al. at 26). The language of 25 CFR § 171.3 requiring tribal authorization cannot be stretched to support such a proposition. As the district court noted in rejecting this claim, a tribe may authorize the Secretary to advertize an area which is larger than and includes the tracts to be offered.
 It is only necessary that the specific tract rest within the authority given by tribal resolution ... If the Tribe wishes to restrict authority to notice only a specific tract then the Tribe need only have the resolution say so.
 
 
 [546]
 F.Supp. at 574. There is no allegation that these tracts lay outside the area authorized or that the Tribe sought to restrict its authorization. The district court was correct in rejecting this assertion by the Tribe
 
 
 [5]
 Although the Tribe prays for relief under the Administrative Procedure Act, 5 USC §§ 701 et seq., inter alia, this does not alter the equitable nature of the court's jurisdiction. It has been recognized that judicial review of administrative action follows equitable principles. See, e.g., Abbott Laboratories v. Gardner, 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681; Ford Motor Co. v. N. L. R. B., 305 U.S. 364, 373, 59 S.Ct. 301, 306, 83 L.Ed. 221; Indiana & Michigan Elec. Co. v. Federal Power Comm'n, 502 F.2d 336, 346 (D.C.Cir.), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424; Reich v. Webb, 336 F.2d 153, 158 (9th Cir.), cert. denied, 380 U.S. 915, 85 S.Ct. 890, 13 L.Ed.2d 800
 
 
 [6]
 For example, Southland Royalty drilled eight wells at a cost of $556,149.75 (VII J.App. A-989-90) and made $53,979 in geological expenditures (VII J.App. A-987-88) before being served in this suit. (See also IV J.App. A-564). Union Oil drilled two exploratory wells before the suit. (IV J.App. A-558-59). Dugan Production drilled two wells before suit. (IV J.App. A-578). Merrion and Bayless Drilling drilled four wells before the suit was commenced. (IV J.App. A-581-82). Also before the suit, Amoco Production, Mesa Petroleum, and Huber Corp. participated together in one well on Lease 485, spending $287,000 for drilling and geological studies. (III J.App. A-438; IV J.App. A-544). Gulf Oil also conducted "some seismic operations." (IV J.App. A-524, 538) (See also 546 F.Supp. at 584)
 
 
 [7]
 We note that in Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820, the Court held that in a decree for cancellation of illegal conveyances of Indian lands, made in violation of restrictions on alienation, the return of the consideration cannot be regarded as essential. The opinion emphasized, however, that this was because to do so might "frustrate the (anti-spendthrift) policy of the statute" because Indians who had squandered the money would not be able to regain their lands. 224 U.S. at 446-47, 32 S.Ct. at 434-35. In our case the policy of the statute and regulations is to obtain a fair price for leases. This policy would not be frustrated by the remedy fashioned by the district court
 
 
 [8]
 The courts have also awarded damages to a plaintiff bringing a bill in good faith "when equitable relief ... would result in undue hardship", Pomeroy, § 237e at 440-42, or where equitable relief is impossible, unnecessary or useless, 27 Am.Jur.2d, Equity § 115 at 642 (1981); E. I. du Pont de Nemours & Co. v. Temple, 272 F. 456, 457-58 (4th Cir.) (damages awarded instead of injunction against nuisance); Cincinnati & C. Traction Co. v. American Bridge Co., 202 F. 184, 186 (6th Cir.) (damages awarded instead of enforcement of lien); Cartwright v. Southern Pac. Co., 206 F. 234 (D.Or.) (injunction against maintaining river dikes denied but equitable jurisdiction retained to consider monetary relief); see also Mitchell v. Robert DeMario Jewelery, Inc., 361 U.S. 288, 290-92, 80 S.Ct. 332, 334-35, 4 L.Ed.2d 323 (court having injunctive power to restrain violations may order reimbursement for wages lost due to retaliatory discharge); Porter v. Warner Holding Co., 328 U.S. 395, 398-400 & n. 2, 66 S.Ct. 1086, 1089-90 & n.2, 90 L.Ed. 1332 (restitution of illegal rents may be ordered where price-control statute provides for "injunction, restraining order, or other order"). But see Le Clair v. Shell Oil Co., 183 F.Supp. 255, 263-64 (S.D.Ill.) (equity court had no power to assess money damages unless the injunction was awarded)
 
 
 [9]
 The trial court, in addition to the factors of delay and prejudice, relied on public policy considerations in concluding that the NEPA claim was barred by laches. One of these considerations was that the goals of NEPA were adequately protected without granting the relief sought by the Tribe. 546 F.Supp. at 581
 We are uncertain as to the appropriateness of this policy consideration, as Congress has mandated the completion of an EIS when major federal action significantly affecting the quality of the human environment is involved. Congress has chosen the procedural protections of NEPA to serve the public's interest in protecting the environment. See Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1250 (10th Cir.). This choice as the mandate of Congress could be undercut if other studies are accepted or if we make a substitute judgment on the public interest. We need not reach this issue, however, as we uphold the laches ruling due to the delay and prejudice factors.
 
 
 [10]
 The cases cited by the Tribe for the proposition that it was justified in assuming that the Government would comply with the requirements of NEPA are not inconsistent with our holding. In Environmental Defense Fund v. Alexander, and Save Our Wetlands, Inc. v. United States Army Corps of Engineers, 549 F.2d 1021, 1027-28 (5th Cir.), cert. denied, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98, the district courts' application of laches was upheld. While the court in Cady v. Morton, 527 F.2d 786, 792-93 (9th Cir.), did conclude that the trial court erred in finding laches, the case is distinguishable. In Cady the preparation of an EIS had begun, and the court of appeals held that lack of diligence was not established where the plaintiffs refrained from commencing an action challenging the adequacy of the EIS until they could ascertain its contents
 
 
 [11]
 The Tribe argues that Tribal sovereign immunity precludes application of laches and similar defenses. It cites Board of County Commissioners v. United States, 308 U.S. 343, 350-51, 60 S.Ct. 285, 288, 84 L.Ed. 313, and its statements that nothing the State can do will be allowed to destroy the federal right to be vindicated, that the State cannot invade the immunities of Indians, and that state notions of laches and limitations have no application to suits by the Government whether on behalf of the Indians or otherwise. Such cases deal with the rights of Indians qua Indians, rights created and protected by federal laws and treaties. However, the concerns addressed by NEPA do not relate to rights of Indians per se, and NEPA instead advances substantive goals for the nation as a whole by "essentially procedural" requirements. See Strycker's Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433. Thus the trial court did not err in holding that the Tribe's NEPA claim was subject to the doctrine of laches
 11a Furthermore, in applying federal law we are persuaded that this is not a matter on which we should follow local law. On this point the factors to consider are
 whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law.
 Wilson v. Omaha Indian Tribe, 442 U.S. 653, 672-73, 99 S.Ct. 2529, 2540, 61 L.Ed.2d 153.
 Applying this test, we conclude that a uniform rule is required. The provisions of the leases at issue, as well as the procedures for their purchase by the lessee defendants, are determined by federal law and regulations. The parties to the leases would therefore expect disputes to be resolved by federal law. Moreover, unlike the situation in Wilson, the States have little interest in having their own laws resolve conflicts such as these. Compare id. at 674, 99 S.Ct. at 2541. While the application of state law may not seriously undermine federal policy or functions, we conclude, after applying all of the factors noted above, that a uniform federal rule is preferable. Cf. California, ex. rel., State Lands Commission v. United States, --- U.S. ----, ----, 102 S.Ct. 2432, 2438-39, 73 L.Ed.2d ----. Thus the Libby case is not controlling here.
 11b The opinion of the district court ordered that the primary terms of all the leases are tolled for "the tolling period." 546 F.Supp. at 585. The tolling period was then defined by the court as follows:
 For purposes of this order the tolling date is the date upon which the particular lessee was served with process in this case. The tolling period is the period from tolling date to the date of judgment entered herein.
 11c The brief of the lessee defendants described the tolling period as being "pendente lite" and as the period during the "pendency of this action and appeal," (Brief and Answer Brief of Appellees Amoco et al at 60, 71), which the opinion does not appear to support. The lessee defendants have not asked for a modification of the judgment on this point and neither the Tribe nor the Secretary addressed this issue.
 
 
 [12]
 The court in Twyford held that the lease at issue should not be cancelled and that the lessee should have been required to pay rentals arising during the pendency of the action. The lessee defendants argue, however, that the basis of these holdings was not the lessor's assertion of the lease's invalidity which would suspend the obligation to pay rentals, but the lessee's good faith attempt to pay the rentals because of which it would be inequitable to grant a forfeiture. (Brief and Answer Brief of Appellees Amoco et al. at 71)
 We agree that there were two alternative bases for the court's holding that the lease should not be forfeited. Thus to the extent the court relied on the lessee's good faith effort to pay the rentals to support its holding denying forfeiture and its holding requiring the lessee to pay rentals during the pendency of the action, the case does not support the principle for which it is cited above-that where a lessor actively challenges the validity of the lease, a lessee is not relieved from liability for payment of rentals if the validity of the lease is established. Twyford has, however, been cited for this principle. See H. Williams and C. Meyers, Oil and Gas Law, § 606.6, p. 182 n.1.
 
 
 [13]
 The following lessees' counterclaims were predicated upon court-ordered cancellation: Mesa Petroleum Co. (II R. 365, 366, 368, 369, 370, 372); Dugan Production Corp. (Counts I-III only) (II R. 528, 529, 530); Tesoro Petroleum Co. (II R. 619); North American Exploration Co. (II R. 619); and Nassau Resources, Inc., (II R. 622)
 
 
 [14]
 Of course, this is not to say that where Congress waives the United States' sovereign immunity it implicitly waives the immunity of Indian tribes also
 
 
 [15]
 The counterclaims' assertions of a general inequitable or wrongful action by filing and maintaining suit seem to be in the nature of a claim for wrongful or malicious prosecution and thus not one arising out of the same transaction or occurrence. EEOC v. First Nat'l Bank of Jackson, 614 F.2d 1004, 1008 (5th Cir.), cert. denied, 450 U.S. 917, 101 S.Ct. 1361, 67 L.Ed.2d 342; United States v. Levering, 446 F.Supp. 977, 978 (D.Del.); cf. 3 Moore's Federal Practice P 13.13 at 13-308 & n.25 (2d ed. 1982). In fact, such claims might well be premature before determination of the Tribe's suit. Ibid
 
 
 [16]
 It was alleged that the Tribe had not sought the cancellation of other oil and gas development contracts on which the Government had conducted no environmental review apart from that conducted in connection with the leases here in issue
 
 
 [17]
 The Tribe argues that it failed timely to file a bill of costs because of confusion as to who was "the prevailing party" and therefore as to who was "the party recovering costs."
 
 
 [18]
 There is authority indicating that costs in the district court can be assessed after appeal. Popeil Bros., Inc. v. Schick Electric, Inc., 516 F.2d 772, 777 & n.5 (7th Cir.); Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 119 F.2d 316, 326 (6th Cir.), rev'd on other grounds, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381; Brennan v. Frisch Dixie, Inc., 61 F.R.D. 419, 420 (W.D.Ky.), aff'd, 492 F.2d 1243; Fleischer v. AAP, Inc., 36 F.R.D. 31, 33 (S.D.N.Y.)