**TWYFORD et al. v. WHITCHURCH.**

**No. 2544.**

Circuit Court of Appeals, Tenth Circuit.

Dec. 16, 1942.

W. E. Utterback, of Durant, Okl. (Joe W. Curtis, of Pauls Valley, Okl., on the brief), for appellants.

Wm. G. Davisson, of Ardmore, Okl., for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

On November 19, 1934, Lee Statler and Ed King were the owners of a 160-acre tract of land in Coal County, Oklahoma. The record title stood in the name of Statler. The state of Oklahoma held a mortgage on the land. The Commissioners of the Land Office of the state of Oklahoma had obtained a judgment in foreclosure and the land had been sold in the foreclosure proceedings and a sheriff's deed issued. Certain tax sales certificates were also outstanding against the land.

Statler, acting for himself and King, entered into a contract with Hart, Twyford, and Smith, whereby Twyford and Smith, members of the Oklahoma bar, agreed to prosecute an action to vacate the sheriff's deed and set aside the judgment on the ground that no proper service had been made upon Statler in the foreclosure proceedings, and Statler agreed to convey 20 per cent of the mineral rights in the land to Twyford and Smith and 20 per cent of the mineral rights in the land to Hart.

Thereafter, the parties to the contract agreed that Statler should execute and deliver an oil lease on the land and, with the proceeds of advance royalties received, discharge the mortgage and tax liens, and that such oil lease should be superior to the mineral rights of Twyford, Smith, and Hart.

Early in 1935, Twyford, Smith, and Hart requested Statler to execute two mineral deeds, one running to Twyford and Smith and the other running to Davis. They agreed not to record the deeds until the lease had been executed and recorded

and the land redeemed from the mortgage.[1] Statler executed the mineral deeds on February 8, 1935. Each deed conveyed an undivided one-fifth interest in minerals in the land. Each recited "The intention hereof is to convey an undivided 32-acre interest, subject to oil and gas lease." Hart owned the beneficial title under the deed to Davis.

Contrary to their agreement with Statler, Twyford, Smith, and Hart recorded the mineral deeds on September 18, 1935.

On November 13, 1935, Statler and King executed and delivered to C. G. Whitchurch an oil and gas lease on the land, commonly referred to as an "unless" lease. The lease provided that it should run for a term of ten years and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them could be produced. It reserved a one-eighth royalty to Statler and King. It provided that if operations for the drilling of a well for oil and gas should not be commenced on the land on or before one year from the date of the lease, the lease should terminate unless the lessee should, on or before one year from the date, pay or tender to the lessor or for the lessor's credit in the First State Bank of Stonewall, Oklahoma,[2] or its successor, which bank and its successor should be the lessor's agent, and should continue as the depository of any and all sums payable under the lease, the sum of $160 to operate as a rental and cover the privilege of deferring the commencement of drilling operations for a period of one year. It provided in like manner and upon like payments or tenders, the commencement of drilling operations could be deferred for like periods successively. As further consideration for the lease, Whitchurch paid $2,000 advance royalty to Statler and King and paid the state $8,298.33 to discharge the

mortgage. The lease was recorded November 14, 1935.

Before the Whitchurch lease was given, Statler showed Whitchurch a copy of the contract between him and Twyford, Smith, and Hart and the letters set out in Note 1, and Whitchurch relied thereon.

On November 18, 1935, Twyford, Smith, and Hart recorded the contract of November 19, 1934.

On December 12, 1935, Davis executed and delivered to A. D. Hudspeth, Jr., a mineral deed purporting to convey some interest in the minerals in the land. On the same day Hudspeth executed and delivered three mineral deeds purporting to convey some interest in the minerals in the land, one to Claude Wright, one to J. V. Holt, and one to Davis. All of the mineral deeds referred to in this paragraph were executed, delivered, and recorded after the recordation of the Whitchurch lease.

On December 31, 1934, Statler executed an oil and gas lease, in which the name of the lessee was left blank, in order to aid in the sale of an oil and gas lease to raise funds with which to discharge the mortgage. No consideration was ever paid therefor. The name of W. A. Villines was thereafter filled in the lease as lessee, without the knowledge or consent of Statler. Twyford, Smith, Hart, and Davis[3] had notice of the facts respecting such lease and knew that it was not executed for the purpose of conveying title to Villines.

On November 15, 1935, Davis, acting as trustee for Hart, and Twyford and Smith made and delivered to the Pacific Petroleum Company, a corporation in which Twyford and Smith were officers and directors, an oil and gas lease on the land. It was recorded on November 16, 1935. At the time of the execution of such lease the par-

---

[1] On January 21, 1935, Twyford and Smith wrote Statler in part as follows:

"We herewith enclose Mineral Deeds, one to us and one to B. B. Davis. The latter is drawn in this form at the request of Walter L. Hart. Please execute these deeds and either mail them to us or send them to Ed King to be delivered to us as soon as the advertisement is withdrawn. We will not record these until the land has been redeemed and your lease has been delivered to the purchaser and recorded."

On February 2, 1935, Hart wrote Statler in part as follows:

"They all realize that we are not foolish enough to record our royalty deeds ahead of the lease for the reason that would not only blow the deal up, but the deeds themselves would be of no value until redemption is had.

"They all understand this and agree that our deed should be delivered now for fear that something might happen, death or otherwise."

[2] Hereinafter called the State Bank.

[3] Hereinafter referred to collectively as the appellants.

ties thereto had both actual and constructive notice of the Whitchurch lease.

On November 23, 1935, William G. Davisson, acting as attorney for Whitchurch, wrote a letter to Twyford, Smith, and Davis wherein he asserted that Whitchurch's lease was prior and superior to their mineral deeds and claims of title and requested them to execute the necessary instruments to recognize the priority of the Whitchurch lease over their grants and claims of title. In a letter to Davisson dated December 10, 1935, Twyford and Smith asserted that the mineral deeds to them and Hart and the Villines lease were prior and superior to the Whitchurch lease, and refused to subordinate their claims of title to the Whitchurch lease. At all times thereafter Twyford, Smith, and Hart denied the validity of the Whitchurch lease and asserted that their claims of title were superior thereto.

Whitchurch paid the rentals to the State Bank for the years 1936, 1937, 1938, and 1939. The State Bank went into liquidation on June 13, 1940. On July 4, 1940, the Case State Bank[4] opened for business in the building formerly occupied by the State Bank. The Case Bank had purchased the assets of the defunct State Bank. It did not assume any of the latter's liabilities. The Case Bank was a separate and distinct corporate entity. On November 2, 1940, Whitchurch sent a draft for $160 by registered mail to the State Bank to pay the rental for one year from November 13, 1940. Whitchurch did not then know the State Bank had closed. Receipt for the registered letter was signed on November 14, 1940, as follows: "First State Bank, J. W. King, Jr." King was not the agent of the State Bank. He mailed the check back to Whitchurch on November 14, 1940, accompanied by a letter stating that the State Bank had been closed since June 12, 1940, and that the Case Bank was not a true successor to the State Bank, and that the draft would have to be made payable to the Case Bank in order for it to receive the draft. Thereafter, Whitchurch sent the rental in money by messenger to the Case Bank, accompanied by a rental deposit receipt to be signed by the Case Bank. The receipt was dated October 31, 1940, but was actually received and signed sometime between November 15, 1940, and January 2, 1941. It recited the amount due to the various landowners. It was executed by King, as cashier of the Case Bank.

The appellants had refused to accept the delay rentals deposited prior to November, 1940.

Whitchurch commenced this action in the state court against appellants, and others. His petition contains two causes of action. In the first, he sought a decree quieting the title to his lease. In the second, he sought damages on account of the failure of the defendants below to recognize the validity of his lease. The cause was removed to the District Court of the United States for the Eastern District of Oklahoma. After removal, it was held that venue was lacking as to the second cause of action and it was dismissed. No appeal was taken from the order of dismissal. The trial court found the facts substantially as hereinbefore stated, except the facts with respect to the payment of rental,[5] and entered a judgment quieting the title of Whitchurch in the lease as against the appellants, and the other defendants below.

The sole contention presented on this appeal is that prior to the entry of the judgment on November 12, 1941, the lease expired on November 13, 1940, due to the failure of Whitchurch to pay the delay rental for the period from November 13, 1940, to November 13, 1941.

Although appellants have denied the validity of the Whitchurch lease continuously since November, 1935, they now demand a forfeiture thereof on account of Whitchurch's failure to pay delay rental from and after November 13, 1940.

Where a lessee under an "unless" oil and gas lease is ready, able, and willing either to develop the premises or to pay rentals, an attack upon the lessee's title by the lessor will relieve the lessee of the duty either to proceed with drilling operations or pay the delay rental specified in the lease during the continuance of the challenge to his title.[6]

---

[4] Hereinafter called the Case Bank.

[5] The court made no finding with respect to the payment of rentals.

[6] Hudspeth v. Schmelzer, 182 Okl. 416, 77 P.2d 1123, 1126; Simons v. McDaniel, 154 Okl. 168, 7 P.2d 419, 420, 421; Chap-man v. Bowers, 180 Okl. 49, 67 P.2d 788, 789; McCallister v. Texas Company, Tex.Civ.App., 223 S.W. 859, 862.

In Hudspeth v. Schmelzer, supra, the court said: "Such a declaration of forfeiture is an attack upon the title of the

Furthermore, Whitchurch made a timely effort to pay the rental for the period from November 13, 1940. He was prevented from so doing through an excusable mistake. He had not been advised that the State Bank had been closed. Thereafter, believing that the Case Bank was the successor of the State Bank, he paid the rental to the Case Bank. Appellants had refused to receive the rentals paid for the preceding years to the State Bank and at the trial their counsel admitted that they would not have accepted the rental for 1940 if such rental had been tendered to them before the date on which it fell due.

Where the lessee in an "unless" lease in good faith manifests his intention to continue the lease by undertaking to pay such rental, through the method and means customarily used in such transactions, in ample time for the payment to reach the lessor or the agreed depository on or before the due date, but due to accident or mistake such payment fails to reach the lessor in time, the lease is not because of such failure automatically terminated. This is true because the acts of the lessee manifest an intention not to terminate the lease.[7] A termination of the lease because of such unintentional failure would result in a forfeiture. Equity will lend its aid to the enforcement of a forfeiture only where to do so is consonant with the principles of right, justice, and morality.[8] Under the facts in the instant case, it is more consonant with the principles of equity to deny than to grant a forfeiture.

We conclude that the lease should not be forfeited for failure to pay rentals.

The judgment should have required Whitchurch to pay the delay rentals for the period of one year from November 13, 1940, and for the subsequent periods within a reasonable time to be fixed by the court.

The cause is reversed, with instructions to the trial court to modify the judgment accordingly.

The costs will be assessed against the appellants.

---

lessees, and they are thereby relieved of the duty of proceeding further during the continuance of such attack. Chapman v. Bowers, 1937, 180 Okl. 49, 67 P. 2d 788; Simons v. McDaniel, 1932, 154 Okl. 168, 7 P.2d 419; Consumers' Gas Trust Co. v. Worth, 1904, 163 Ind. 141, 71 N.E. 489; LaFayette Gas Co. v. Kelsay, 1905, 164 Ind. 563, 74 N.E. 7; Texas Pac. Coal & Oil Co. v. Patton, Tex.Com.App.1922, 238 S.W. 202. * * * Neither is the lessee required to pay delay rentals under these circumstances, because 'a lessor may not enforce a forfeiture for failure to drill or pay delay rental within the time stipulated in the lease, if the failure of the lessee to drill or pay is attributable to the fault of the lessor.' Summers on Oil & Gas, § 160." [182 Okl. 416, 77 P.2d 1126.]

[7] Gloyd v. Midwest Refining Co., 10 Cir., 62 F.2d 483, 486, 487; Oldfield v. Gypsy Oil Co., 123 Okl. 293, 253 P. 298, 299; Brazell v. Soucek, 130 Okl. 204, 266 P. 442; Brunson v. Carter Oil Co., D.C.Okl., 259 F. 656; Brunson v. Carter Oil Co., D.C.Okl., 263 F. 935; Harvey v. Benmo Oil Co., D.C.Okl., 272 F. 475.

The last three cases were cited with approval in Oldfield v. Gypsy Oil Co., supra.

[8] Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, 819; Liddle v. Cook, 8 Cir., 209 F. 182, 187; Lindeke v. Associates Realty Co., 8 Cir., 146 F. 630, 640; Gloyd v. Midwest Refining Co., 10 Cir., 62 F.2d 483, 486; 30 C.J.S., Equity, § 57, pp. 398, 399.