**John R. HOOTON, Jr., Trustee, Plaintiff-Appellee,**

**v.**

**NACARATO GMC TRUCK, INC., Defendant-Appellant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 3, 1989.

Application for Permission to Appeal Denied by Supreme Court May 1, 1989.

Nader Baydoun, John I. Harris, III and Harris & Baydoun, Nashville, for plaintiff-appellee.

Alfred H. Knight and Willis & Knight, Nashville, for defendant-appellant.

## OPINION

LEWIS, Judge.

Defendant, Nacarato GMC Truck, Inc. (Nacarato), has appealed from the judgment of the Chancery Court forfeiting its lease on land and commercial buildings in Davidson County, Tennessee, from which it operated a truck sales franchise. The forfeiture was based upon the Chancellor's finding that Nacarato had failed to "promptly undertake" certain repairs to the leased premises after being notified by plaintiff to do so and thereby "breached the lease." Plaintiff was also awarded attorney's fees in the amount of $30,000.

The pertinent facts are as follows:

Nacarato leased several acres of land and the buildings on the land from plaintiff on 27 March 1976 for the sum of $9,819 per month. The original term of the lease was to expire on 31 March 1981. The lease contains an option provision for four additional five-year periods which effectively makes it a twenty-five year lease.

Portions of the buildings were constructed in the mid or late 1950's and other portions in 1965. In December 1986 the original roofing was still on all of the buildings, except the roof over the work bay in the main building, which had been replaced by Nacarato in November 1986. The roof had leaked almost from the time Nacarato had leased the premises and had been repaired by patching throughout the years. The overhead doors in the main building were wood and were approximately thirty years old at the time of trial.

The lease contains the following pertinent provisions:

5. Lessee agrees, during the term of this lease, to keep the leased premises in good repair. Lessee agrees to comply with all orders, rules and regulations of the authority of the State of Tennessee, Metropolitan Government of Nashville and Davidson County, Tennessee, or other governmental agencies having jurisdiction thereof, and the Nashville Board of Fire Underwriters affecting such insured premises. Lessor shall not be obligated to make any repairs to the premises during the term of this lease.

6. Lessee shall have the right, at its own expense, to make such changes, alterations and improvements on the premises as it may desire, provided such changes, alterations or improvements do not affect the structural portion of the construction. The Lessee agrees that all improvements, changes or alterations shall be and become a part of the leased premises, but Lessee shall continue to hold and shall have the right at the termination of the lease, to remove any trade fixtures on said leased premises, provided same can be removed without damage to the building, and in the event of such damage, Lessee agrees to repair same.

The lease further provides:

Lessee shall, upon the payment of rent and other charges and performing the covenants and agreements contained herein, peacefully and quietly enjoy the possession and use of the entire demised premises, for the term herein provided, subject only to the provisions of this lease, and to the provisions of a certain sublease agreement by and between General Truck Sales, Inc. and Fleet Kleen, Inc., dated May 1, 1975, covering a portion of the demised premises being service bays in the main building. Upon termination of this lease by lapse of time, forfeiture, breach of condition, or in any other manner, Lessee agrees to give quiet and peaceable possession of the leased premises to Lessor, and to restore said premises in as good condition as when delivered, ordinary wear and tear

or damage by fire or other casualties excepted.

The lease also contains a forfeiture provision which is as follows:

It is further understood and agreed that each and all of the terms, covenants undertakings and agreements contained herein shall be and are to be construed as conditions, and upon the failure of the Lessee to pay said rent or any installment thereof as provided in Paragraph 3 hereof, or upon its breach of or failure to perform and comply with any other of the covenants, undertakings or agreements contained in this lease within ten (10) days after notice of default, Lessor reserves the right to, and may elect at any time to declare this lease forfeited and at an end, and to re-enter and take possession of the premises, and in this event Lessor may re-rent said premises to such tenants as, in the opinion of the Lessor, are suitable and proper and Lessor may hold Lessee liable for any loss occurring by reason of such re-renting and for any damages to the premises, and so, for each and every failure or breach during the term of this lease, it being expressly agreed that the failure on the part of Lessor to declare this lease forfeited, shall not be considered as a waiver of his right to elect as to any subsequent breach, the right being a continuing one.

In the Summer of 1985, Nacarato approached plaintiff and informed him that he had received offers to purchase his dealership but that two of the prospective purchasers did not want to assume the lease. Mr. Nacarato told plaintiff that he wished to sell his interest in the lease to plaintiff. They negotiated a price of $700,000, conditional upon plaintiff being successful in locating a purchaser for the property.

Plaintiff hired a real estate broker who located a potential purchaser for the property. This potential purchaser agreed to pay $2,600,000 conditioned upon the purchaser's inspection of the property.

When the prospective purchaser inspected the property, he determined that several repairs and replacements were needed, including repairs or replacements of the roof, the overhead doors, gutters, and removal of asbestos material. The repairs and/or replacements were extensive and estimated to cost $500,000. Plaintiff then revised his offer of $700,000 to purchase Nacarato's interest in the lease downward to cover the costs of the estimated cost of repairs and/or replacements. This ended the negotiation for plaintiff's purchase of Nacarato's interest in the lease. Subsequently, the offer to purchase the premises was withdrawn.

Thereafter, a second buyer was found. This second buyer likewise inspected the property and refused to go forward with the purchase of the property unless the premises were repaired.

On 2 December 1986, plaintiff's then attorney wrote to Nacarato. The pertinent portion of that letter is as follows:

I represent Mr. John Hooton who has asked me to review your lease agreement regarding repairs to the building occupied by Nacarato GMC Truck, Inc. Mr. Hooton has had the building inspected and has been advised that the roof covering the service bays and the front of the building, as well as the door to the service bays, are in need of immediate repair or replacement. Section 5 of the lease agreement requires the tenant to make these repairs or replacements, and failure to do so is a breach of the lease agreement.

5. Lessee agrees, during the term of this lease to keep the leased premises in good repair. Lessee agrees to comply with all orders, rules and regulations of the authority of the State of Tennessee, Metropolitan Government of Nashville and Davidson County, Tennessee, or other governmental agencies having jurisdiction thereof, and the Nashville Board of Fire Underwriters affecting such insured premises. Lessor shall not be obligated to make any repairs to the premises during the term of this lease.

The necessary work to repair of [*sic*] replace the roof and service bay doors must be started immediately to avoid fur-

ther damage to the building. This letter is notice of default of the terms of the lease agreement and demand is made to cure or commence to cure the default in ten (10) days. Failure to cure or commence to cure will result in termination of the lease agreement. Please advise me as to when this work will commence.

Nacarato replied to the 2 December 1986 letter on 9 December 1986. The pertinent part of Nacarato's reply is as follows:

We are in receipt of your letter dated December 2, 1986.

Please be advised we have already requested two contracts to bid on the repairs of the roof. As soon as it is practicable, we will have a contractor commence making the necessary repairs.

You are welcome to inquire at a later date or we will so advise when repairs are started.

Nacarato's attorney also responded by letter dated 11 December 1986 with assurances that Nacarato was undertaking to commence the repairs.

Carl Cotton, a roofing contractor who eventually replaced the roof on the main building of the leased premises, testified that Mr. Nacarato called him on 11 December 1986 and told him that "he had some leaks in the service department he wanted to see about getting repaired." Mr. Cotton went to the premises "about the middle of December" and found "some places that could be causing trouble." Cotton attempted to repair the roof by patching. His workmen went to the premises "two or three times" after it had rained to determine whether the repairs they had made had been successful. When the repairs proved unsuccessful, they did further patching. "Around mid-February" Cotton informed Nacarato that "we wasn't doing much good and he needed to put a new roof on [the building] if he wanted to stop the leaks." Cotton testified that Mr. Nacarato, in response, told him to "give [me] a bid." Cotton testified that he gave a bid for replacement of the roof on 17 February 1987 and Mr. Nacarato asked him "how soon can you get to me?" Thereafter, Mr.

Nacarato called Cotton at least one time and asked him "when are you coming?"

Cotton began removal and replacement of the roof on 20 April 1987 and completed it on 5 May 1987.

Cotton testified that he started the replacement of the roof "as quickly and competently" as he could "given the weather and other circumstances with which [he] was faced in December of '86 and the early winter of '87."

Gunnar Teidt, a door supplier, testified that his company was first contacted in early December 1986 to "come and examine the [overhead] doors." He subsequently came, made a survey of the replacement that needed to be made and submitted a bid. Nacarato subsequently contacted Mr. Teidt and told him that additional replacements were necessary. Mr. Teidt, on 23 April 1987, submitted a second bid. Because the doors were old, the panels could not be replaced from stock and it was necessary to have them manufactured. The panels were ordered by Mr. Teidt in late April 1987 and subsequently received from the manufacturer. The replacement panels were installed in June or July, 1987.

In April 1987, plaintiff retained a different lawyer who, on 9 April 1987, wrote Nacarato informing him that he was in default, that his lease was forfeited, demanded that Nacarato vacate the premises, and also provided a list of additional repairs which the attorney stated were required under the termination provisions of the lease.

After Nacarato refused to vacate the leased premises, plaintiff instituted this suit.

Nacarato has presented three issues. However, we deem it necessary to address only two of those. We will pretermit Nacarato's first issue and, for the purposes of this appeal, assume that Nacarato was responsible for the replacement of the roof and overhead doors.

Assuming that duty, we must first determine if Nacarato commenced remedying the defects complained of in the 2 Decem-

ber letter within ten days [1] after receiving the notice and secondly, assuming that the repairs and replacements were not commenced within the ten days or a reasonable time, should the remedy of forfeiture under all the circumstances have been imposed.

Nacarato, within ten days of receiving plaintiff's 2 December 1986 letter, had contacted the roofing contractor and in December, either within the ten-day period or very shortly thereafter, had contacted a door supplier. The 2 December letter demanded that Nacarato "cure or commence to cure" the problems with the roof and overhead doors. Nacarato replied to plaintiff by letter dated 9 December 1986 that "as soon as it is practicable we will have a contractor commence making the repairs." Plaintiff made no objections. About the "middle of December" the roofing contractor made an effort to patch that portion of the roof that was leaking. When his first efforts did not bring results, the contractor sent his employees back "two or three times" to do further patching. The additional patching did not work and Nacarato was told sometime in February 1987 that "a new roof [was needed] if he wanted to stop the leaking." After Nacarato received the bid on 17 February 1987 for replacement of the roof, the contractor was asked: "How soon can you get to me?" Sometime after that Nacarato called the contractor and asked: "When are you coming?" The roof replacement began on 20 April 1987 and was completed on 5 May 1987.

Plaintiff argues that even if contacting a roofer and undertaking to patch the roof "was the commencement of the repairs to the roof, the repairs did not actually commence until the ten-day period had expired." Accepting this argument as true, we must also look to the fact that on 9 December Nacarato responded to plaintiff that the "repairs of the roof" would be commenced "as soon as it is practicable." So far as the record shows, plaintiff made no objection to commencing the repairs "as

soon as it is practicable." He acquiesced in the repairs being commenced as soon as practicable.

Plaintiff argues that "Nacarato did not call anyone to repair the doors until late March or April 1987." The record shows that while a formal contract for the replacement of the door panels was not entered into until 28 April 1987, Nacarato did contact the door supplier in December. The supplier came to the premises, made a survey of needed replacements, and submitted the bid to Nacarato. Nacarato subsequently called the supplier and told him that additional replacements were necessary. The supplier then made an additional bid. A contract was entered into and the supplier sent the order to the manufacturer in late April. Because the doors were quite old, the panels could not be exactly duplicated. It was necessary that the panels be constructed by the manufacturer. This was done and they were installed in June or July 1987.

While plaintiff testified that he was dissatisfied with the progress of repairs before the 9 April 1987 letter of forfeiture was sent to Nacarato, there is no evidence that he ever communicated that dissatisfaction to Nacarato.

The Chancellor concluded that a forfeiture of the lease was justified because the repairs had not been "promptly undertaken" and because the actual replacement of the roof did not commence until 8 April and the door panels were not ordered until 23 April 1987.

The Chancellor also stated that conditions other than those set forth in the 2 December 1986 notice of default were considered in ordering the forfeiture and that plaintiff should not be required to "struggle for years and years with a tenant over maintenance."

■ Conditions not included in the notice of default cannot properly serve as a basis for forfeiture. The Chancellor also stated

---

1. The record is not clear whether the door supplier was contacted within ten days. However, the evidence is that he was contacted in December. The burden of proof of showing that Na- carato did not comply would be upon the plaintiff. So far as the record shows he did not carry that burden.

that "the roof is still in bad shape." There is no evidence that that portion of the roof referred to in the notice of default is in bad shape. The Chancellor presumedly refers to some other portion of the roof.

The findings of fact of the Chancellor are reviewed de novo upon the record made in the trial court and those findings are presumed to be correct unless the evidence preponderates otherwise. Tenn.R.App.P. 13(d). However, this presumption does not attach to the subjective conclusions of the Chancellor.

■ The Chancellor seems to have found that the 2 December 1986 notice of default letter which called upon Nacarato to "commence to repair or replace" to mean that the active physical work of replacing the roof and the doors had to begin within the ten-day period.

We are of the opinion that the facts do not support this conclusion. The parties did not by their actions intend this interpretation. When Nacarato responded on 9 December 1986 and their attorney on 11 December 1986, they each stated they were in the process of getting bids for the roof repairs and "as soon as is practicable, we will have a contractor commence making the necessary repairs."

Plaintiff made no objection. Plaintiff did not insist that physical repairs commence within ten days. To the contrary, plaintiff became involved in the roofing by asking for information about the price, the nature of the re-roofing and the possibility of changing the slope of the roof for better drainage.

Nacarato commenced the repairs as required by the 2 December letter and they were ultimately completed.

■ Even if repairs had not been "promptly undertaken," equity precludes a forfeiture of the lease.

■ Forfeitures are not illegal *per se* and will be enforced unless contrary to equity and justice. However, the law does not favor forfeitures and they will be strictly construed. *Simmons v. Hitt*, 546 S.W.2d 587, 591 (Tenn.App.1976) (citation omitted).

■ Forfeitures will be enforced only within the letter and spirit of the law. *Sanders v. Sanders*, 40 Tenn.App. 20, 33, 288 S.W.2d 473, 479 (1955). The law favors the enforcement and preservation rather than the forfeiture of rights. *Burchfield v. Hodges*, 29 Tenn.App. 488, 500–501, 197 S.W.2d 815, 820 (1946).

■ Before a court will enforce a forfeiture, there must be clear proof of the right to the forfeiture and the grounds on which the forfeiture is allowed must be well established. Every reasonable presumption is against forfeiture and every intendment or presumption is against the party seeking to enforce the forfeiture. 17A C.J.S. *Contracts* § 407 (1963).

Forfeitures are not favored in equity and unless the penalty is fairly proportionate to damages suffered by the breach, relief will be granted when the lessor can, by compensation or otherwise, be placed in the same condition as if the breach had not occurred. *Humphrey v. Humphrey*, 254 Ala. 395, 48 So.(2d) 424, 31 A.L.R.(2d) 315; *Twyford v. Whitchurch*, 9 Cir., 132 F.(2d) 819; 3 Thompson on Real Property, Sec. 1467, p. 712; 32 Am. Jur., Landlord and Tenant, Sec. 847, pp 720–721. The underlying principle is that a court of equity is a court of conscience and nothing will be permitted within its jurisdiction which is unconscionable. So a person, although having a legal right, will not be permitted to avail himself of that right for the purpose of injury or oppression. 16 A.L.R. 437, 31 A.L.R.(2d) 321.

In 3 Story, Equity Jurisprudence, 14th Edition, Sec. 1726, it is said to be a general principle "that wherever a penalty is inserted merely to secure the performance or enjoyment of a collateral object, the latter is considered as the principal intent of the instrument, and the penalty is deemed only as accessory, and therefore as intended only to secure the due performance thereof or the damage really incurred by the non-performance. In every such case the true test (generally if not universally) by which to

ascertain whether relief can or cannot be had in equity is to consider whether compensation can be made or not. If it cannot be made, then Courts of Equity will not interfere. If it can be made, then if the penalty is to secure the mere payment of money, Courts of Equity will relieve the party upon paying the principal and interest."

The foregoing doctrine "has been applied by Courts of Equity to cases of leases where a forfeiture of the estate and an entry for the forfeiture is stipulated for in the lease in case of the non-payment of the rent at the regular days of payment; for the right of entry is deemed to be intended to be a mere security for the payment of the rent. * * * And in cases of this sort admitting of compensation there is rarely any distinction allowed in Court of Equity between conditions precedent and conditions subsequent." 3 Story, Equity Jurisprudence, 14th Edition, Sec. 1727.

*Hasden v. McGinnis*, 54 Tenn.App. 39, 43–44, 387 S.W.2d 631, 633 (1964).

The Chancellor, while holding that Nacarato did not commence and complete the repairs in a timely manner, did not indicate what would have been timely. The Chancellor did not find that damages had been inflicted upon plaintiff by Nacarato's failure to complete the repairs in a timely manner. In fact, the Chancellor specifically found that plaintiff had suffered no damages as a result of the breach.

On the other hand, the forfeiture has inflicted damages upon Nacarato by depriving him of a lease worth a minimum of $200,000. (Plaintiff had offered $700,000 for the Nacarato interest and revised that offer by the amount the first respective purchaser said it would take to bring the buildings up to the purchaser's standard, $500,000.) Additionally, the forfeiture resulted in the rent being increased to $30,000 per month, more than triple the lease price.

In *Hasden v. McGinnis*, 54 Tenn.App. 39, 42, 387 S.W.2d 631, 632 (1964), this Court affirmed the trial court's finding that "to allow this forfeiture to stand would constitute unjust enrichment and would result in property worth at least $125,000 to be taken over for $50,000, and this disparity shocks the conscience of the Court...." This Court went on to say that under the economic circumstances such a forfeiture would be "unjust, inequitable, and unconscionable." 54 Tenn.App. at 44, 387 S.W.2d at 633.

The Chancellor also found that plaintiff "should not be expected to go through years and years of struggling with his tenant over maintenance." Our review of the record does not disclose that plaintiff has struggled with Nacarato through the years over maintenance.

There was an occasion when the first mortgage holder was dissatisfied with the state of repairs of the building. Nacarato made the necessary repairs and the first mortgage holder wrote to Nacarato thanking Nacarato for taking care of the maintenance problems.

We are of the opinion that under all the circumstances, equity precludes the forfeiture of the lease.

 The judgment of the Chancellor in ordering the forfeiture is reversed. However, paragraph 15 of the lease provides that "Lessee agrees to pay any attorney's fees incurred by Lessor in enforcing any of the Lessor's rights under this lease." Plaintiff did incur attorney's fees in informing Nacarato that there were needed repairs and in seeing that those repairs were made. While an attorney's fee is justified for this service, we do not believe that a fee of $30,000 is reasonable. Therefore, the fee of $30,000 will be set aside and, on remand, the Chancellor shall conduct a hearing to determine a reasonable fee.

CANTRELL and KOCH, JJ., concur.